FREDERICK O. PRINCE & others *vs.* GEORGE G. CROCKER
& others.

Suffolk.    March 26, 27, 1896. — June 15, 1896.

Present: FIELD, C. J., ALLEN, HOLMES, MORTON, & BARKER, JJ.

*Boston Subway Act — Acceptance of Statute by City — Locus Standi — Constitutionality of Statute — "Public Use" — Eminent Domain — Taking Land already devoted to Public Use — Waiver of Contract — Municipal Debt Limit — Right to construct Subway on Public Garden — "Building" — "Leave of the General Court" — Substituted Legislation — Consent of Inhabitants of City.*

Judicial notice should be taken of the acceptance of a statute by the voters of a city at an election held in accordance with its provisions.

The vote to accept a statute, at a special election held in a city in accordance with its provisions, is sufficient to give taxpaying inhabitants of the city a standing to maintain a bill in equity, under Pub. Sts. c. 27, § 129, to prevent an alleged illegal use of public money under the authority of the statute.

It is no objection to the validity of St. 1894, c. 548, authorizing the construction of a subway in Boston, that it imposes a heavy debt upon the city and to a certain extent takes away from the city the control of its streets; and the acceptance of the statute by the voters of the city is a sufficient consent to its provisions, if such consent were necessary.

It is immaterial that by St. 1894, c. 548, authorizing the construction of a subway in Boston, the work is not put in charge of the street commissioners of the city. The Legislature may provide for doing the work at the expense of the city, but through other agents than those regularly appointed by the city, and may impose liability on the city, incur the expense, and require payment by the city; and the acceptance of the statute by the voters of the city precludes objection on this ground by taxpaying inhabitants, even if such objection would otherwise have been open; and these considerations apply to the bridge over Charles River provided for in § 30, as well as to the subway itself.

The construction of a subway in Boston, under the authority conferred by St. 1894, c. 548, which empowers the Transit Commission to grant a lease of it, when finished, to any street railway company for fifty years, is for a public use; and it is within the constitutional power of the Legislature to order or sanction taxation for it.

The St. 1894, c. 548, authorizing the construction of a subway in Boston, is not in violation of the Fourteenth Amendment to the Constitution of the United States.

A person cannot be heard to object to the constitutionality of a statute on grounds which only affect others than himself.

Land already appropriated to one public use may be taken by authority or direction of the Legislature for another public use.

A body of persons in their capacity of taxpaying citizens of Boston, or as voters,

or as a constituted part of the public at large, can assert no right to the continued use of the Common or of the Public Garden as public parks, or to have compensation paid for the surrender of such use, against the combined action of the Legislature in passing St. 1894, c. 548, authorizing the construction of a subway, and of the inhabitants of the city in accepting the statute.

If the provision of St. 1859, c. 210, § 3, that no building, except such as are expedient for horticultural purposes, shall thereafter be erected upon the territory in Boston occupied by the Public Garden, constituted a contract between the Commonwealth and the city, the latter, being a party to it, may waive it, and the acceptance by the voters of the city of St. 1894, c. 548, authorizing the construction of a subway thereon shows such waiver.

As the same authority which fixes the limit of a municipal indebtedness may change it, and as St. 1894, c. 548, authorizing the construction of a subway in Boston, and requiring, in § 37, the treasurer of the city to issue bonds, also provides that the debt shall not be included in determining the limit of indebtedness, there is no ground for the contention that the statute is invalid because the work to be done under it will increase the debt of the city beyond the limit · of indebtedness fixed by St. 1885, c. 178, § 2; it not appearing that the limit of indebtedness as thus extended will be exceeded by the issue of the bonds.

Under Sts. 1894, c. 548, § 29, and 1895, c. 440, § 3, authorizing the construction of a subway in Boston, the Public Garden may be entered upon for such construction so far as is necessary in order to make a suitable connection with surface tracks, but no further. FIELD, C. J., dissenting.

The permission of the Legislature, given by St. 1894, c. 548, to build in Boston a subway such as is adapted for the uses and purposes described in § 25, by implication authorizes such a structure as is necessary and reasonable for those purposes, and, in the absence of any averment to the contrary in a bill in equity to have the statute declared invalid, it will be assumed that the present structure on the Public Garden is within this implied authority, and, if the subway is a "building," the "leave of the General Court," which is required by Pub. Sts. c. 54, § 16, for the erection of a building exceeding certain dimensions upon a public common or park, is given, by the giving of authority to enter with the subway upon the Public Garden for a short distance west of Charles Street.

The legislation embodied in St. 1894, c. 548, authorizing the entry upon the Public Garden in Boston for the construction of a subway, and providing that the work shall not be begun until the statute has been accepted by a majority of the voters of the city, is a substitute, so far as the subway on the Common and Public Garden is concerned, for Pub. Sts. c. 54, § 13, providing that no street railway shall be constructed over a public common or park without the consent of the inhabitants of the city or town, and the acceptance of the subway act, by the voters of the city, furnishes all the consent on the part of the inhabitants that is necessary.

BILL IN EQUITY, filed originally on April 22, 1895, and, as finally amended, on October 11, 1895, by eighteen inhabitants of and taxpayers in the city of Boston, against George G. Crocker, Charles H. Dalton, Thomas J. Gargan, George F. Swain, and Albert C. Burrage, members of the Boston Transit Commission, alleging that on July 1, 1894, the act entitled "An Act to incorporate the Boston Elevated Railway Company, and to promote

rapid transit in the city of Boston and vicinity," being chapter 548 of the acts of that year, was passed,* and was approved on the following day; that the statute, if lawful and valid, would operate to deprive the city of Boston of many of the rights and

---

* This statute incorporates the Boston Elevated Railway Company, with power to construct and operate lines of elevated railway in and through the streets of Boston and certain adjacent cities and towns, the details of which, comprised in the first twenty-two sections, are not material in this case.

Sections 23 and 24 provide for the appointment and organization of a board to be known as the Boston Transit Commission.

Section 25 provides as follows : " Said commission may construct in the city of Boston a subway or subways of sufficient size for four railway tracks, with approaches, entrances, sidings, stations, and connections therefor, and for the running of railway cars thereon, through and under Tremont Street and the adjoining mall of Boston Common, or other public or private lands adjoining or near said street, from a point or points within one thousand feet of the junction of Tremont Street and Shawmut Avenue to, through, and under Scollay Square," etc.

Section 26 provides as follows : " Said commission may construct a tunnel or tunnels of sufficient size for two railway tracks, with approaches, entrances, sidings, stations, and connections therefor, and for the running of railway cars therein, from a point on or near Scollay Square in the city of Boston, where a suitable connection may be made with the subway or subways provided for by this act, to a point on or near Maverick Square, in that part of Boston called East Boston, where a suitable connection with surface tracks may be made."

Section 27 provides as follows: " Said commission may also construct subways, to be used for the same purposes as said other subways, but which may be made of sufficient width for two tracks only, as follows : From Tremont Street through and under Boylston Street and the adjoining mall of Boston Common or other public or private lands adjoining said street to a point on or near Boylston Street, where a suitable connection with surface tracks may be made; from Boylston Street through and under Park Square and Columbus Avenue or other lands adjoining said square and avenue to a point on or near Columbus Avenue, where a suitable connection with surface tracks may be made, and from Tremont Street through and under Park Street and the adjoining mall of Boston Common," etc.

Section 28 provides for the filing of a plan showing the route or location of the part of each subway to be constructed. .

Section 29 provides as follows : " Said commission may locate and construct said subways, tunnels, approaches, tracks, sidings, stations, entrances, and connections where it deems best within the limits aforesaid, and may place the entrances to the portions of said subways and tunnels intended for one railway at points along the aforesaid routes distinct and different from the entrances to the portions intended for another railway, but shall not permanently occupy above the surface of the ground for any purpose

privileges belonging to its inhabitants, and especially to infringe those rights which relate to the control by the aldermen and street commissioners of the streets and highways of the city, and the regulation of the traffic in, upon, and over the streets, including the tracks previously laid therein for the accommodation of street railways, and for the use and enjoyment of the streets of the city by its inhabitants, and all other persons having occasion to use the streets in the conduct of their business; that the statute is in direct violation of the rights of the city as

any part of said Common, except so much of the Tremont and Boylston Street Malls as may be necessary for stairways to stations and coverings therefor," etc.

Section 30 provides as follows: " Said commission shall construct a bridge over Charles River, having regard to its use for railway purposes, between the present Charles River bridge and the Fitchburg Railroad bridge," etc.

Section 31 authorizes the commission, for the purposes of the act, to use public ways and lands, and to take, by purchase or otherwise, any other lands and easements, or rights therein.

Section 32 provides for the recording in the registry of deeds of a description of the lands, easements, or rights so taken.

Section 33 provides for the removal of buildings from lands taken, and the sale or lease of property taken and not needed for the purposes of the act.

Section 34 provides for the determination of damages for property injured or taken under authority of the act.

Section 35 provides as follows : " Said commission may, on or before the completion of said subways and tunnels, grant locations for tracks to, and for two tracks in, said subways and tunnels, to be used by any street railway company or companies; shall order all surface tracks to be removed from Tremont Street between Boylston Street and Scollay Square, and from Boylston Street between Park Square and Tremont Street; . . . said commission shall, subject to the approval of the board of railroad commissioners, fix by contract the terms and conditions and rates of compensation for the locations for said two tracks in any of said subways and tunnels, and for the use thereof by any street railway company or companies during a term of years not exceeding fifty."

Section 36 authorizes the removal or relocation of any surface tracks, conduits, pipes, wires, or poles, which interfere with the construction or operation of any such subway, tunnel, or railway.

Section 37 provides as follows: " The treasurer of the city of Boston shall from time to time, on the request of said commission, issue, and sell at public or private sale, bonds, registered or with interest coupon attached, as he may deem best, in the name and behalf of said city, to an amount not exceeding seven millions of dollars, and such further amount for said

a municipal corporation, and as the owner of property in its corporate capacity in trust for the inhabitants, without any provision therein made for compensation, and for this reason is invalid and void; that, if the commissioners are permitted to proceed in the execution of the enterprise committed to them by the statute, they will involve the city in an indebtedness or liability of many millions of dollars beyond or in excess of the limit of indebtedness imposed and prescribed by the laws of the Commonwealth, and will do this without the authority of the city council, as provided in such cases, or the consent of the taxpaying citizens of the city; that the commissioners, under the

---

Charlestown bridge and its approaches, in addition to the seven hundred and fifty thousand dollars heretofore appropriated therefor by the city council of said city, as may be necessary for the completion of said bridge and approaches.  Said bonds, including said seven hundred and fifty thousand dollars, shall be designated on their face Rapid Transit Loan, shall be for the term of forty years, and at rates of interest not exceeding four per cent per annum, as said treasurer shall determine, payable semiannually.   The debt incurred under the provisions of this section, except the seven hundred and fifty thousand dollars aforesaid, shall not be included in determining the limit of indebtedness of said city."

Section 38 provides for the establishment of a sinking fund for the payment of the bonds issued under the act.

Section 39 provides for the taking of a strip or strips of land to be used for an elevated railway, and for such other public purposes as the commission shall determine.

Section 40, which is the concluding section, is as follows: "This act shall take effect upon its passage; but said railroad corporation shall not do any work in any public way or place, or take any land under the right of eminent domain, nor shall said Boston Transit Commission take any land or commence the construction of any subway or tunnel until this act shall be accepted by a majority of the voters of said city voting at some special election called by the mayor of said city, or at some State or municipal election designated by said mayor, such election to be held during the year eighteen hundred and ninety-four."

The St. 1895, c. 440, entitled " An Act relative to the construction of subways in the city of Boston," provides, in § 3, as follows: " No portion of the Common, with the exception of the malls on Boylston and Tremont Streets shall be permanently occupied above the surface of the ground for any of the purposes of the subway, except so far as necessary for the suitable ventilation thereof, and no portion of said malls shall be permanently occupied above the surface of the ground except so far as necessary for suitable ventilation, and for shelter and other accommodations at the station entrances and exits."

pretended authority of the statute, have already applied to the treasurer of the city, and have procured the issue by him of the bonds of the city to the amount of one million of dollars, and thus have caused the city to incur a debt to that amount, to be hereafter paid by the taxation of the taxpayers of the city; that the commissioners, if not restrained, will hereafter apply to the treasurer of the city for the issue of more bonds, and will take the proceeds thereof and apply the same to the construction of the subway or subways, and will thereby subject the taxpayers of the city to still further liabilities and assessments for the payment of the bonds, with interest thereon, without lawful authority conferred on them for that purpose; that by the terms of the charter of the city, as it existed on July 2, 1894, the only persons or officers authorized to incur any indebtedness on account or in the name of the city or its taxpaying citizens was the city council; that, by the provisions of this statute, the taxpayers of the city would be subjected to taxation, and their property to liability for debts contracted, not by themselves or by representatives of their own choosing, and over the amount of which they would have no control; that this legislation is in direct contravention of the right of local self-government, and it is not in the legitimate power of the Legislature to deprive the citizens of Boston of the right to control and regulate their own local affairs and expenditures according to their own judgment and discretion, and through officers and agents of their own selection for that purpose; that the inhabitants of the town of Boston, long prior to its incorporation as a city, were the owners in fee of certain lands dedicated to their use and enjoyment, and subject to their control as the property of the inhabitants, and subject to their management under the laws of the Commonwealth; that, since the charter creating the city of Boston, the title to these lands and all other common property has been vested in the city as a municipal corporation; that these lands included all the premises now embraced between Beacon Street on the north, Park Street, Tremont Street, and Boylston Street on the east and south, and Arlington Street on the west, being the premises known as Boston Common and the Public Garden; that by an act of the Legislature, passed February 23, 1822, "establishing the city of Boston," it was provided that

the inhabitants should become a municipal corporation, and that the officers chosen by them for the purpose should have the control of all the fiscal, prudential, and municipal concerns of the city, and the administration and government thereof in every respect; that, among other things, it was provided that the city council should have the care and superintendence of the public buildings, and the care, custody, and management of all the property of the city, with power to lease or sell the same, excepting the portion thereof consisting of Boston Common and Faneuil Hall, and the act was duly submitted to and accepted by the then inhabitants of the town of Boston, and still remains in full force, except as modified and amended; that the act establishing the city was amended by St. 1854, c. 448, § 39, entitled "An Act to revise the charter of the city of Boston," which act contained this provision : "The city council shall have the care and superintendence of the public buildings, and the care, custody, and management of all the property of the city, with power to lease or sell the same, except the Common and Faneuil Hall "; that, by universal consent of the inhabitants of the city, this provision of the charter has been strictly observed, and the Common and Public Garden have been uniformly treated by the inhabitants as their estate, the title of which was held by the city government or corporation in trust for their use and enjoyment forever ; that on or about March 28, 1895, the defendants together with J. Edwin Jones and Michael Meehan entered upon the Public Garden, and with their tools, implements, agents, and servants proceeded to remove walks, trees, and shrubbery therefrom, and to excavate therein for a long distance for the alleged purpose of constructing a road-bed for tracks for a street railway, or for street railway cars to be placed and operated thereon, (not by the city of Boston or for its use and benefit,) and with the declared intention of extending the road-bed for the street railway, or railway cars, through and over the Public Garden to and through the Common, and, in pursuance of the same purpose, they also proceeded to excavate, or cause to be excavated, the Common, and to remove the walks, trees, and shrubbery therefrom; that the defendants pretend that they are authorized to undertake and prosecute this work under or by virtue of St. 1894, c. 548; that the statute is not valid and binding in law,

and furnishes no authority or warrant to the defendants, or to Jones and Meehan, or to their agents or servants, for entering upon or prosecuting the work; that by Pub. Sts. c. 54, § 13, it is provided that no railroad or street railway shall be laid out or constructed over a common or park dedicated to the use of the public, or appropriated to such use without interruption for a period of twenty years, unless with the consent of the inhabitants of the city or town after public notice given in the manner provided in cases of the location and alteration of highways, setting forth the extent and limit of the portion thereof proposed to be taken; that the defendants have not complied with nor undertaken to comply with the provision of the above statute in this respect, but have proceeded without any regard to such provision or a compliance therewith by any one; that the subway proposed to be built by the defendants is not for the use of the public in any correct legal sense of that term, and if it were built it could be used only for the accommodation of railway cars for carrying passengers for hire, and it does not appear that it ever would be wanted or used for that purpose by any persons or corporations, unless under or by virtue of the power of compelling such use, which the Legislature has seen fit to undertake to impart to the Subway Commissioners; that no provision whatever is made by the statute for the payment of damages to the city for any of its lands taken or to be taken by the defendants, nor for the payment of damages to private persons owning or claiming to own rights and interests in the streets to be traversed by the subway or subways, by reason of the encroachments thereon of the defendants, their agents or servants; ' that the defendants have employed Jones and Meehan to perform the work of constructing the subway, or a considerable portion thereof, and have entered into a written contract with them for that purpose, and Jones and Meehan are now engaged, with many men, carts, horses, tools, and implements in prosecuting the work, and will continue to prosecute such work unless restrained; that Jones and Meehan have been employed by the defendants to construct the subway, or portions thereof, not only in the Public Garden and Boston Common, but also through or under and across Charles Street, at a point in Charles Street distant about seventy-five feet northerly of the intersection of Charles Street with Boylston

Street, and have contracted with the defendants to make a connection between the Public Garden portions and the Common portions of the subway by carrying the same through, across, and under Charles Street, and will so construct the subway across Charles Street unless prevented; that neither the defendants nor the contractors are lawfully authorized by the statute to construct the subway across or under Charles Street at the point mentioned, or any other point in that street; that by Pub. Sts. c. 54, § 16, it is provided that no building exceeding six hundred square feet in "area upon the ground shall be erected in or upon a common or park dedicated to the use of the public, without leave of the General Court"; that the Public Garden is a common or park dedicated to the use of the public or the inhabitants of the city of Boston for upwards of twenty years, and the defendants have erected in and upon the Public Garden a building greatly exceeding in area six hundred square feet, " without leave of the General Court"; that the building extends westerly from Charles Street about four hundred feet; that its side walls rest on piles driven into the ground in the course of its construction to a distance of twenty feet or more, and cut off below tide water level to receive stone foundations in the manner usual and customary in the erection of buildings upon land of that character; that' upon the piles the side walls of the building are laid and carried up to a height of four feet above the level of the ground, as it was before the building was begun; that for about one hundred feet westerly from Charles Street the building is roofed with iron or steel and other material; that for about three hundred feet farther it is as yet without any roof, but its walls are capped with hammered stone of massive dimensions; that this construction by the defendants is in violation of the provisions of Pub. Sts. c. 54, § 16, and is without warrant by any subsequent legislation; that the defendants, " having already taken and appropriated for subway uses and purposes so much of the Boylston Street end of the Public Garden as lies between Charles Street and the line of Church Street extended, are now intending to take for said purposes so much of the southerly end of said garden, adjoining and within seventy feet of Boylston Street, as lies between Arlington Street and the strip of said Public Garden previously taken by said

Commissioners, and to lay out upon and over the surface of said garden, for a distance of four or five hundred feet, a railway road-bed for the purpose of connecting the subway incline (so called) with the tracks of the West End Street Railway westerly of Arlington Street, and will do this unless prevented"; and that no such use of the Public Garden by the defendants is authorized by the statute.

The prayer of the bill was that it might be decreed that the St. 1894, c. 548, so far as the same relates to the proposed subway and the construction thereof by the defendants, is invalid, and furnishes the defendants no warrant or authority for constructing the subway, or for procuring the issue of the bonds or notes of the city of Boston from the treasurer of the city for that purpose; that it might also be decreed that the treasurer is not lawfully empowered by the statute to make and issue such notes or bonds, or to dispose of the same for the purpose of constructing the subway; and that the defendants might be ordered to desist from all further proceedings in constructing the subway, or any part thereof; and for other and further relief.

The defendants demurred to the bill, assigning the following grounds therefor: "1. The plaintiffs have not stated such a case as entitles them to any relief in equity against these defendants, or either of them. 2. The plaintiffs are improperly joined therein. 3. The Attorney General of the Commonwealth is a necessary party to the bill, and is not joined as party thereto. 4. The city of Boston is a necessary party to the bill, and is not joined as a party thereto. 5. The holders of bonds referred to in the bill are necessary parties thereto, and are not joined therein. 6. The bill is multifarious, in that distinct causes of action against the defendants are improperly joined therein; distinct causes of action are alleged against different defendants; the relief sought is various, and does not similarly apply to all defendants."

The city of Boston, upon its motion, was admitted as a party defendant, and demurred to the bill, assigning the same grounds relied upon by the other defendants, except the fourth.

Hearing on the bill and demurrers before *Morton*, J., who, on the admission of the plaintiffs that they did not rely on the allegation in the bill as to extending the subway from opposite

Church Street to Arlington Street, in view of the statement which was made by the defendants, that there was no intention on their part to do so, sustained the demurrers, and reported the case for the consideration of the full court.

If the court should be of opinion that, after all such amendments germane to the bill as may be suggested at the argument are made, either by bringing in new parties or otherwise, there will remain insuperable objections to the maintenance of the bill, the demurrers were to be sustained and the bill dismissed; otherwise, the demurrers were to be overruled, and the case to stand for amendment and further hearing.

*F. A. Brooks & J. D. Bryant*, for the plaintiffs.

*S. Lincoln*, (*F. W. Kittredge & T. M. Babson* with him,) for the defendants.

ALLEN, J.   The general complaint of the plaintiffs, as stated in their bill, is, that if the Transit Commissioners are permitted to proceed in the execution of the enterprise committed to them by St. 1894, c. 548, they will involve the city of Boston in an indebtedness or liability of many millions of dollars beyond the limit of indebtedness prescribed by the laws of the Commonwealth, and will do this without the authority of the city council or the consent of the taxpaying citizens; and also that this statute would have the effect to deprive the city of many rights and privileges belonging to its inhabitants, and especially that it would infringe rights which relate to the control of the streets and highways of the city by the aldermen and street commissioners; all in violation of the right of the inhabitants of the city to govern themselves.

It is provided by § 40 of the statute that the Transit Commission shall not " take any land or commence the construction of any subway or tunnel until this act shall be accepted by a majority of the voters of said city voting at some special election called by the mayor," etc.   In the printed copy of the subway legislation furnished to us by mutual consent of counsel, it is stated that this act was accepted at a special election held on July 24, 1894.   There is no averment in the bill that no such vote of acceptance had been passed, and though the briefs on both sides say little or nothing on this point, yet it is implied in the brief furnished by one of the counsel for the plaintiffs (Mr. Bryant)

that there had been such an acceptance; and it is then contended that the people at the polls are not the tribunal to determine what debts shall be incurred by or in behalf of the city, because, by a law which stands unrepealed, that question is to be determined by both branches of the city government, and a two thirds vote of each branch is required to authorize the incurring of a debt by the city. As the fact of the acceptance of the statute has significance, in certain aspects of the questions presented, we will state at the outset that, in the absence of any averment to the contrary, we assume that such a vote of acceptance was duly passed. This is a fact of which the court should take judicial notice. *Andrews* v. *Knox County*, 70 Ill. 65. *State* v. *Swift*, 69 Ind. 505. *Rauch* v. *Commonwealth*, 78 Penn. St. 490. Moreover, it is very doubtful, to say the least, whether the plaintiffs, as taxpaying inhabitants, have any standing to maintain the bill in their own names, except upon the assumption that the vote to accept the statute is virtually a vote to raise or to pay money within the meaning of Pub. Sts. c. 27, § 129. In this Commonwealth, contrary to what has been held in some other jurisdictions, a suit like the present has been considered not to fall within the general jurisdiction of a court of equity. *Baldwin* v. *Wilbraham*, 140 Mass. 459. *Steele* v. *Municipal Signal Co.* 160 Mass. 36. *Carlton* v. *Salem*, 103 Mass. 141. By Pub. Sts. c. 27, § 129, when a town votes to raise by taxation or pledge of its credit, or to pay from its treasury, any money for a purpose other than those for which it has the legal right and power, it may be restrained by this court upon the suit or petition of not less than ten taxable inhabitants. The case of *Frost* v. *Belmont*, 6 Allen, 152, was brought under St. 1847, c. 37, which was like Pub. Sts. c. 27, § 129. The case of *Lowell* v. *Boston*, 111 Mass. 454, was also brought under the similar provision found in Gen. Sts. c. 18, § 79. No point was there made that under the statute the petitioners had no right to be heard. It is contended, however, by the present defendants, that the plaintiffs have no standing to maintain this bill; but, in favor of affording a remedy against a use of public money which is supposed to be illegal, we think a somewhat liberal construction should be given, and that the vote to accept the statute is sufficient to give the plaintiffs a standing in court under Pub. Sts. c. 27, § 129.

The two principal grounds upon which the plaintiffs contend that St. 1894, c. 548, as a whole, is invalid, are that it imposes a heavy debt upon the city, and to a certain extent takes away from the city the control of its streets.  The plaintiffs deny the power of the Legislature to do either of these things without the authority of the city council, or the consent of the tax-paying citizens of the city.  It has, however, been established, by a great weight of usage and authority, that the Legislature may impose such a duty and burden upon towns and cities without their own consent.  We do not deem it necessary to go into an extended discussion of this subject, or to consider what objects may be so special or local in their character as not to come within the general rule.  As to roads of all kinds, and bridges and sewers, the doctrine is well established, in this Commonwealth and elsewhere, that the Legislature may prescribe what shall be done, and require cities and towns to bear the expense to such an extent and in such proportions as it may determine. The powers which have been given to cities and towns by the Legislature, by special or by general laws, are in no sense a contract, and do not become vested rights as against the Legislature.  *Coolidge* v. *Brookline*, 114 Mass. 592, 596, 597.  *Agawam* v. *Hampden*, 130 Mass. 528, 530.  *Kingman, petitioner*, 153 Mass. 566, 573–576.  *People* v. *Morris*, 13 Wend. 325.  *Sloan* v. *State*, 8 Blackf. 361.  *People* v. *Flagg*, 46 N. Y. 401.  *Philadelphia* v. *Field*, 58 Penn. St. 320.  *Pumphrey* v. *Baltimore*, 47 Md. 145.  Dillon, Mun. Corp. (4th ed.) §§ 54, 73, 74, 831, and other cases there cited.

If this power were otherwise doubtful, in the present case the statute under consideration is not peremptory and absolute, but it remained inoperative until accepted by a majority of the voters of the city.  The plaintiffs contend that the statute is to become operative without the authority of the city council, or the consent of the taxpaying citizens ; but if a consent were necessary, we know of no authority or legal reason for requiring any other consent than that of the qualified voters.  In *Merrick* v. *Amherst*, 12 Allen, 500, 506, the court, while intimating that no consent at all was necessary, said : " To guard against all danger of mistake, and to obtain the highest evidence from those most interested that the imposition of the tax was not unequal or disproportionate to the expected benefits, the Legis-

lature required that it should not be laid on the inhabitants of the town, unless two thirds of the voters, at a meeting to be called for the purpose, should assent to its imposition." The instances where Legislatures have provided that towns or cities or counties might or should bear the whole or a portion of the expense of local improvements in case the qualified voters should assent, and not otherwise, are numberless. In our own statutes, from early times, such legislation has been common. In the Public Statutes now in force, many instances are found enacting that cities and towns may by vote accept the provisions of certain statutes, and thereupon shall be subject to certain duties and burdens. There have been many special laws to the same effect. It cannot be necessary to cite more than a few illustrative instances. Pub. Sts. c. 27, §§ 10–13, 27, 44, 65, 69, 74; c. 28, §§ 3, 22, 23; c. 35, § 4; c. 45, §§ 44, 52; c. 50, §§ 20, 22, 25; c. 51, § 10; c. 80, §§ 8–13. By the Second Amendment to the Constitution, city governments cannot be established except with the consent and on the application of a majority of the inhabitants of the town present and voting thereon at a meeting. All of the cities of the Commonwealth have been incorporated under this amendment. *Larcom* v. *Olin*, 160 Mass. 102, 104, 108. When the Legislature imposes such a condition, in order to bind a city or town or county to assume a particular burden, it must be complied with; but an assent by vote will give full effect to the statute, and the city, town, or county will thereupon become bound. *Hampshire* v. *Franklin*, 16 Mass. 76, 87, 90. *Stone* v. *Charlestown*, 114 Mass. 214. *Central Bridge* v. *Lowell*, 15 Gray, 106, 116. *St. Joseph Township* v. *Rogers*, 16 Wall. 644, 662, 663. *Knox County* v. *Aspinwall*, 21 How. 539. Dillon, Mun. Corp. (4th ed.) §§ 44, 519, 526, 551–553, and cases there cited. It is not material that the work is not put in charge of the street commissioners of the city. The Legislature might provide for doing the work at the expense of the city, but through other agents than those regularly appointed by the city; it might impose liability on the city, incur the expense, and require payment by the city. The acceptance of the act by the city precludes objection on this score, even if such objection would otherwise have been open.

The foregoing considerations apply to the bridge over Charles River, provided for in § 30, as well as to the subway itself.

It is further contended that taxation can only be for a public use; that the term "public use," in reference to taxation, has a more restricted meaning than when applied to the taking of land by eminent domain; that the subway will not be a highway, or open and free to be used by the public for driving or walking; that when finished the statute authorizes the Transit Commission virtually to grant a lease of it to any street railway company for fifty years; and that the use of the subway which is contemplated is not a public use.

That the Legislature can authorize a city or town to tax its inhabitants only for public purposes is well settled and familiar. *Opinion of the Justices,* 155 Mass. 598, 601, and cases there cited. But railroads are always held to be built for public use, whether the right to take land, or the right to grant pecuniary aid to them, is considered. The Legislature of this Commonwealth has granted aid to railroad corporations from its own treasury. See instances cited in 153 Mass. 570. It has also, in a number of instances, authorized cities and towns to furnish such aid by subscribing to stock or otherwise. For illustrations, see Sts. 1852, c. 156; 1855, cc. 394, 395; 1860, cc. 34, 184; 1861, c. 98; 1862, cc. 56, 78; 1863, cc. 96, 104, 105; 1864, cc. 11, 242, 245, 246, 249, 260. At last, such municipal aid was authorized by general laws. Sts. 1870, c. 325, § 3; 1874, c. 372, § 35. Pub. Sts. c. 112, § 46. The constitutionality of such legislation has not been brought into direct controversy before this court, but indirectly it has been recognized. *Kittredge* v. *North Brookfield,* 138 Mass. 286. *Commonwealth* v. *Williamstown,* 156 Mass. 70. And elsewhere it has been established by such a weight of judicial authority that we regard it as settled. *Olcott* v. *Supervisors,* 16 Wall. 678, 694–696. *Railroad Co.* v. *Otoe County,* 16 Wall. 667. *Pine Grove Township* v. *Talcott,* 19 Wall. 666. Dillon, Mun. Corp. (4th ed.) §§ 153–158, 508. The building of the subway for the carriage of such passengers as pay the regular fare is therefore for a public use; and it is within the constitutional power of the Legislature to order or sanction taxation for it.

The plaintiffs also contend that the statute is in violation of the Fourteenth Amendment to the Constitution of the United States. This objection is not dwelt upon in argument, and it is enough to say that we think it is unfounded.

The plaintiffs further contend that the statute is unconstitutional because it omits to provide for compensation for property taken or injured, and especially for taking part of the Common and Public Garden. But the plaintiffs cannot be heard to object to the constitutionality of the statute on grounds which only affect others than themselves. *Hingham & Quincy Bridge* v. *Norfolk,* 6 Allen, 353. *Davis* v. *County Commissioners,* 153 Mass. 218, 228. So far as other private owners are concerned, the plaintiffs do not represent them, and have no standing to be heard in their behalf.

In respect to the matter of providing compensation, the stress of the argument of the plaintiffs rests on the contention that there is no provision for compensation for so much of the Common and Public Garden as may be taken. It is urged that these were dedicated to the use and enjoyment of the inhabitants of the town long before the city charter was granted, and that they are held by the city in trust, to secure and promote such use; that the city, as trustee for these purposes, is entitled to compensation if any part of either is taken ; and that the fact that the city is the party to pay, as well as to receive, does not affect this argument, because the city acts in two different capacities.

If we assume that the plaintiffs are entitled to be heard on this branch of the argument, it is well settled that land already appropriated to one public use may be taken by authority or direction of the Legislature for another public use. *Old Colony Railroad* v. *Framingham Water Co.* 153 Mass. 561. We do not need to go into any nice consideration of the precise capacity, interest, or duty of the city in caring for the Common or Public Garden, because both the Legislature and the city have consented to such new use of both as may be included within the terms of the statute. If the right to their use is in the inhabitants of the city, their vote accepting the act binds them. If it is in the public at large, as distinguished from the inhabitants of the city, the interests of the public are under the protection of the Legislature. The plaintiffs, in their capacity of taxpaying citizens of Boston, or as voters, or as a constituent part of the public at large, can assert no right to the continued use of the Common or of the Public Garden, as public parks, or to have compensation paid for the surrender of such use, against the combined

action of the Legislature in passing the statute, and of the inhabitants of the city in accepting it. *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234. Dillon, Mun. Corp. (4th ed.) §§ 599 n., 650–651 a, and cases there cited. Under these circumstances, we need not pursue the questions relating to the title to and interest of the public in public parks, — questions somewhat discussed in *Abbott* v. *Cottage City,* 143 Mass. 521, and *Attorney General* v. *Abbott,* 154 Mass. 323.

It is also contended by the plaintiffs that, if St. 1894, c. 548, bears such a construction as to allow the Transit Commission to enter the Public Garden with the subway, the statute is unconstitutional, because it impairs the obligation of a contract between the Commonwealth and the city. This supposed contract is found in St. 1859, c. 210, § 3, which provided that the commissioners on the Back Bay should fill up and complete, at the expense of the Commonwealth, so much of Arlington Street as remained to be completed, and the strip of land easterly of said street which had theretofore been released by the Commonwealth to the city, and, further, that "no building shall hereafter be erected between Arlington and Charles Streets, except such as are expedient for horticultural purposes." It is argued that this is a contract that the Commonwealth would not erect a building there, and that the subway, as constructed, is a building, and, if it is authorized by St. 1894, c. 548, then that the statute is a violation of said contract. The short answer to this argument is that the inhabitants of the city have accepted St. 1894, c. 548, and so have consented to whatever is contained therein. Contracts may be waived by the parties to them. If this was a contract, the city was a party to it, and might waive it.

The plaintiffs also contend that the statute is invalid because the work to be done under it will increase the debt of the city much beyond the limit of municipal indebtedness fixed by St. 1885, c. 178, § 2. But the same authority which fixed that limit may change it; and § 37, which requires the treasurer of the city to issue bonds, also provides that this debt shall not be included in determining the limit of indebtedness. Similar exceptions have been very numerous in the legislation of the last ten years. See Blue Book for 1895, p. 805. There is no averment in the bill that the limit of indebtedness as thus ex-

tended will be exceeded by the issue of the bonds provided for by St. 1894, c. 548.

It is also argued by the plaintiffs that the statute does not authorize any entry upon the Public Garden, that at any rate it does not authorize the erection of a building thereon, and that the subway as constructed there is a building, which is in violation of Pub. Sts. c. 54, §§ 16, 17.

In determining whether an entry upon the Public Garden is authorized, the court will take notice of the situation of the streets and squares and public grounds. The Boylston Street Mall upon the southerly side of the Common extends westerly along the line of Boylston Street, from Tremont Street to Charles Street, which last named street separates the Common from the Public Garden, and Park Square is a space open for travel south of Boylston Street and bounding thereon, and is in part opposite to the southerly end of Charles Street, where it joins Boylston Street at right angles. Columbus Avenue opens into Park Square from the southwest.

The St. of 1894, c. 548, § 25, authorizes the Transit Commission to construct a subway or subways of sufficient size for four railway tracks, with approaches, entrances, sidings, stations, and connections therefor, and for the running of railway cars thereon, through and under Tremont Street and the adjoining mall of Boston Common, etc. Section 27 authorizes the commission also to " construct subways, to be used for the same purposes as said other subways, but which may be made of sufficient width for two tracks only, as follows : From Tremont Street through and under Boylston Street and the adjoining mall of Boston Common, or other public or private lands adjoining said street, to a point on or near Boylston Street where a suitable connection with surface tracks may be made ; from Boylston Street through and under Park Square and Columbus Avenue, or other lands adjoining said square and avenue, to a point on or near Columbus Avenue, where a suitable connection with surface tracks may be made, and from Tremont Street through and under Park Street," etc. Section 29 provides that " Said commission may locate and construct said subways, tunnels, approaches, tracks, sidings, stations, entrances, and connections where it deems best within the limits aforesaid, . . . but shall not permanently occupy above

the surface of the ground for any purpose any part of said Common, except so much of the Tremont and Boylston Street Malls as may be necessary for stairways to stations and coverings therefor." Section 35 provides that "Said commission may, on or before the completion of said subways and tunnels, grant locations for tracks, . . . shall order all surface tracks to be removed . . . from Boylston Street between Park Square and Tremont Streets." By St. 1895, c. 440, § 3, it is provided that "No portion of the Common, with the exception of the malls on Boylston and Tremont Streets, shall be permanently occupied above the surface of the ground for any of the purposes of the subway, except so far as necessary for the suitable ventilation thereof, and no portion of said malls shall be permanently occupied above the surface of the ground except so far as necessary for suitable ventilation, and for shelter and other accommodations at the station entrances and exits."

Having reference to the locality, it thus appears that it was probably contemplated that the subway should remain below the surface of the ground in Park Square, and on the Common at the corner of Boylston and Charles Streets; that is, that in going west from Tremont Street it should be under ground till after leaving the Common, and that it should be built through and under Boylston Street and the adjoining mall of Boston Common, or other public or private lands adjoining said street, to a point on or near Boylston Street, where a suitable connection with surface tracks might be made. Since a connection with surface tracks is to be made on or near Boylston Street, and since no such connection can be made east of Charles Street without getting above ground, a right is implied to emerge from under ground west of Charles Street, and to continue the subway for that purpose as far as is necessary, in order to make a suitable connection with surface tracks, but no farther; and, so far as is necessary for that purpose, to enter upon the Public Garden, that being public ground adjoining Boylston Street. The plaintiffs do not aver that the present construction of the subway extends farther upon the Public Garden than is necessary in order to emerge from under ground immediately west of Charles Street, and to make a suitable connection with surface tracks at a point as near as is practicable. If the fact is so, it

should have been averred. It was stated in the argument for the plaintiffs that it had been agreed by counsel that the bill should not be treated as averring an intention to go farther west on the Public Garden than the subway is now built, and the defendants have disclaimed any intention of doing so.

It is further argued for the plaintiffs that the subway, as constructed on the Public Garden, is a building, and that it is in violation of the provision of the Pub. Sts. c. 54, § 16, that "no building exceeding six hundred square feet in area upon the ground shall be erected in or upon a common or park dedicated to the use of the public, without leave of the General Court." The manner of the construction of the subway is set forth, and it is averred that it is a building; but it is not averred in the bill, nor was it suggested in the arguments, that the subway as built is unnecessary or unsuitable or unreasonable in its form or structure, if a subway was to be built at all. The permission of the Legislature to build a subway such as is adapted for the uses and purposes described in § 25 of the statute of 1894, by implication authorizes such a structure as is necessary and reasonable for those purposes, and, in the absence of any averment to the contrary, we must assume the present structure to be within this implied authority; and therefore, if the subway is a building, the leave of the General Court which is required by Pub. Sts. c. 54, § 16, is given, by the giving of authority to enter with the subway upon the Public Garden for a short distance west of Charles Street.

The suggestion is also made that the building of the subway in the Public Garden is in violation of Pub. Sts. c. 54, § 13, providing that "No highway, town way, street, turnpike, canal, railroad, or street railway shall be laid out or constructed over a common or park dedicated to the use of the public, or appropriated to such use without interruption for the period of twenty years, . . . unless with the consent of the inhabitants of the city or town, after public notice, given in the manner provided in cases of the location and alteration of highways." But the Legislature might, and by St. 1894, c. 548, did authorize the subway to extend upon the Public Garden as above explained, and in § 40 it was provided that the Transit Commission should not begin work until the act should be accepted by a majority of

the voters of the city. This legislation was a substitute, so far as the subway on the Common and Public Garden is concerned, for the Pub. Sts. c. 54, § 13, and the acceptance of the statute furnished all the consent on the part of the inhabitants that is necessary.

According to the terms of the report, the entry must be,

*Bill dismissed.*

FIELD, C. J.  I concur with the opinion of the court, except that I think it was not the intention of St. 1894, c. 548, and of St. 1895, c. 440, that any part of the subways should be constructed in the Public Garden. The use to be made of Boston Common in the construction of the subways is very carefully provided for in § 29 of the St. of 1894, and in § 3 of the St. of 1895, but not a word is said concerning the Public Garden in either statute. Considering the very careful provisions made in the statutes concerning the use of the Common for subways, it is improbable that the Legislature would not have made equally careful provisions concerning the use of the Garden if it had supposed that the commissioners could use the Garden for the purposes of the subways, or could construct a subway in or under it. I think that the intention of the Legislature was that the connection of the subway with the surface tracks of the railway on Boylston Street should be made at or near the corner of the Common bounded by Charles and Boylston Streets, and that the incline of the subway for these tracks should begin there. By § 25 of the St. of 1894, the principal subway was to begin at " a point or points within one thousand feet of the junction of Tremont Street and Shawmut Avenue," and was to continue " through and under Tremont Street and the adjoining mall of Boston Common or other public or private lands adjoining or near said street," to Scollay Square, etc. By § 27, subways to be connected with the principal subway might be constructed for the use of the cars which run along Columbus Avenue through Park Square and those which run along Boylston Street. At the time of the passage of these statutes, at the junction of Charles and Boylston Streets and Park Square the surface tracks of the railways were connected with one another. No provision was made by the statutes whereby

the surface tracks on Charles Street should be connected with the subways, but provision was made whereby the surface tracks on Columbus Avenue and on Boylston Street might be so connected. The provision for the Boylston Street tracks is that a subway may be constructed " From Tremont Street through and under Boylston Street and the adjoining mall of Boston Common or other public or private lands adjoining said street to a point on or near Boylston Street, where a suitable connection with surface tracks may be made." The provision for the Columbus Avenue tracks is that a subway may be constructed " from Boylston Street through and under Park Square and Columbus Avenue or other lands adjoining said square and avenue to a point on or near Columbus Avenue, where a suitable connection with surface tracks may be made." The subsidiary subways must unite with the principal subway at or near the corner of Boylston and Tremont Streets. The Columbus Avenue subway, if one is built, must unite with the subway in Boylston Street or in the adjoining mall of Boston Common at or near the junction of Park Square and Boylston Street. I see no authority in the statutes for carrying the subway in Boylston Street, or in the adjoining mall of Boston Common, beyond the junction of Park Square and Boylston Street, or beyond the limits of the adjoining mall on the Common.

The report of the presiding justice states that " on the admission of the plaintiffs that they did not rely on the allegation in the bill as to extending the subway from opposite Church Street to Arlington Street, in view of the statement which was made by the defendants that there was no intention on their part to do so, I sustained the demurrer," etc. The work actually done by the commissioners in the Public Garden perhaps indicated an intention on their part, not of reaching the surface tracks on Boylston Street by the nearest practicable approach to the subway as it was built under Charles Street, but of deflecting the surface tracks on Boylston Street, at its junction with Arlington Street, to the southwesterly side of the Garden, and of laying tracks over the surface of the Garden until they reached the incline of the subway in the Garden. But any such intention, if it ever existed, it seems has been abandoned.

The opinion of the court justifies the construction of the sub-

way in the Public Garden on the ground that it was necessary in order to comply with the provisions of § 29 of the St. of 1894, and § 3 of the St. of 1895, to the effect that no part " above the surface " of the Common should be occupied by railway tracks or for any other purpose than for suitable ventilation, for shelter and stairways to stations, and for coverings therefor, and not on the ground that authority was given by the statutes to the Commissioners to use the Garden in any such manner as they saw fit for the purpose of constructing the subway. Without laying much stress upon the employment of the word " tunnel " in the statutes, as distinguished from " subway," the use of an incline beneath the surface of the ground for tracks to reach a subway or tunnel is not, I think, an occupation " above the surface," within the meaning of the provisions of the statutes which have been cited. An incline is a necessary part of the subway, and is to be included within the limits of the subway. The phrase " other public or private lands adjoining said street," found in § 27 of the St. of 1894, is found in other sections of the statute, and cannot be held to extend the termini of the subways as fixed by other provisions of the statutes. The phrase means that within the authorized termini the commissioners may construct the subways in the directions indicated through the land, whether the land be public or private. I do not dissent from the result reached by the court, because before the present suit was brought the subway had been substantially constructed in the Public Garden without any objection, so far as appears, on the part either of the Commonwealth or of the city of Boston ; and I should not feel justified, under such circumstances, in attempting to undo the work there done because I differed in opinion with the commissioners upon the construction to be given to the statutes, unless the construction acted on by them seemed to me impossible; but my opinion is that the statutes were not intended to authorize such a use as they have made of the Public Garden.