HENRY J. CUNNINGHAM *vs.* MAYOR OF CAMBRIDGE.

Suffolk.    January 26, 1916. — February 9, 1916.

Present: RUGG, C. J., DE COURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Constitutional Law. Municipal Corporations. Cambridge. Commissioner of Public Safety. Mandamus. Words, "Officers."*

St. 1915, c. 267, entitled "An Act to simplify the revision of city charters," which establishes four plans for the government of cities and provides that any city, except Boston, may adopt any one of the four plans at an election held in the manner prescribed by the statute without further legislative intervention, is constitutional.

The commissioner of public safety of the city of Cambridge who was appointed under St. 1912, c. 611, cannot since the adoption by that city of Plan B of St. 1915, c. 267, be removed by the mayor under § 2 of the first named statute, which no longer is in force in this regard, and only can be removed in the manner provided by St. 1915, c. 267, Part III, § 6, for the removal of such an officer, that is, by the mayor with the approval of a majority of the members of the city council.

The provision contained in St. 1915, c. 267, Part I, § 5, that "Until superseded under the provisions of this act, the organization of the executive and administrative departments, and the powers and duties of the officers and employees of any city adopting any of the plans provided for in this act, and the

fiscal year of such city shall remain as constituted at the time of the adoption of such plan," does not mean that the definite and general provision as to removals from office under Plan B contained in Part III, § 6, of the same statute shall remain inoperative either indefinitely or until the terms of office of all those subject to the power of removal shall have been terminated in one of the ways existent at the time of their appointment.

In the provision contained in St. 1915, c. 267, Part I, § 11, that "If a majority of the total number of votes cast at a regular State election for and against the adoption of one of the plans of government provided for in this act shall be in favor of its adoption, the provisions of this act, so far as applicable to the form of government under the plan adopted by the city, shall supersede the provisions of its charter and of the general and special laws relating thereto and inconsistent herewith, but not, however, until officers provided for under such plan shall have been duly elected and their terms of office shall have begun," the word "officers" refers only to elective officers, and does not include the commissioner of public safety of the city of Cambridge appointed under St. 1912, c. 611, who, since the adoption by that city of Plan B, by the provision quoted is made subject to removal in the manner provided in the superseding statute.

A petition for a writ of mandamus is a proper remedy for the commissioner of public safety of the city of Cambridge appointed under St. 1912, c. 611, as the head of the police and fire departments of the city consolidated by that statute, seeking an order to the mayor of that city commanding him to desist from removing the petitioner from office without the approval of a majority of the members of the city council.

PETITION, filed on January 5, 1916, for a writ of mandamus as described in the opinion.

The case came on to be heard upon the pleadings and agreed facts before *De Courcy,* J., who, at the request of the parties, reported it for determination by the full court.

*J. F. O'Connell,* for the petitioner.

*J. F. Aylward,* for the respondent.

RUGG, C. J. The petitioner, who is the commissioner of public safety of the city of Cambridge, seeks by this petition for a writ of mandamus to compel the respondent, who is the mayor of the same city, to refrain from attempting to remove him from his office. The petitioner was appointed for a term not yet expired, under the authority of St. 1912, c. 611, by § 2 of which the mayor was empowered to "remove the commissioner for cause, after a hearing." The respondent is undertaking to make the removal by virtue of the supposed authority of that act. At the State election in 1915, the voters of Cambridge accepted Plan B of St. 1915, c. 267. That statute, which is entitled "An Act to simplify the revision of city charters," in effect provides a new charter

for such cities as adopt it, according to the form for which a majority of the votes are cast at a regular election.

St. 1915, c. 267, is an innovation in legislation in this Commonwealth. Heretofore, the General Court has enacted a special act whenever the frame of government of a city was to be changed, applicable to that city alone. By c. 267 it has established four different types of city charter and provided machinery by which any city in the Commonwealth, except Boston, may select for itself the form which its voters decide to be best adapted to its needs, and, after a trial of not less than four years, may change to some other of the four types set out in the statute, all without further legislative action.

By St. 1892, c. 377, the Legislature attempted to frame a model charter, with alternatives as to a city council composed of one or two chambers, and as to a term of office of one or two years for the mayor and the members of a unicameral city council, to be adopted at will by towns of twelve thousand inhabitants or more, whose voters desired the city rather than the town form of government. This statute was held unconstitutional in *Larcom v. Olin*, 160 Mass. 102, for reasons there set forth at length. In brief, the ground was that art. 2 of the Amendments to the Constitution plainly contemplated that the question, whether any municipality should make the initial change from a town to a city form of government, must be decided in each instance as it arose upon petition by the majority of the inhabitants of the town, by the General Court itself, and the particular terms of each city charter which marked that transformation should receive the careful attention of the legislative department of government. This intent of the people in adopting the second amendment to the Constitution doubtless had its foundation in deep-seated regard for the town meeting form of government and a thorough appreciation of the significance of discarding it for administration of local affairs through the city form of government.

Those considerations have no relevancy to the modifications from time to time of the form of city charter when once the transmutation from town to city has been made. City charters, when once accepted, have been amended by the Legislature without request or approval by the inhabitants. 160 Mass. 104. Many laws somewhat general in their scope provide that they shall take effect

in any particular municipality only when accepted by the voters at an election, or when adopted by the city council. The constitutionality of these acts cannot be doubted. They are numerous. *Prince* v. *Crocker*, 166 Mass. 347, 360; *Cole* v. *Tucker*, 164 Mass. 486, 489; *Graham* v. *Roberts*, 200 Mass. 152, 157; *Barnes* v. *Mayor of Chicopee*, 213 Mass. 1, 4.

The instant statute, although more comprehensive as to the administration of municipal affairs than most others, falls within the same principle. It is something of a reversion to the earlier freedom and flexibility of local self-government, which obtained when the town meeting was at its highest development. It is not beyond the power vested by the Constitution in the General Court, to establish several models for the government of cities, and to provide that one or another of these may become operative in any city (with the exception of Boston), already chartered, by the voters at an election held in due form, without further legislative intervention.

The precise question remaining to be decided is, whether the removal from office of the commissioner of public safety in Cambridge is governed by St. 1912, c. 611, or by St. 1915, c. 267, Part III, § 6. It is plain that the former statute is abrogated in this respect and that the latter statute is controlling.

Whenever one of the Plans set forth in St. 1915, c. 267, is adopted by the voters of any city, it becomes effective as a new charter for municipal administration. All that has gone before concerning the same subject matter is revoked except as preserved by the new charter.

The adoption by the voters of one of the four Plans of city charter specified in St. 1915, c. 267, is the equivalent of a new charter specially enacted by the Legislature for the adopting city. Each of the several forms of charter set forth in the act is intended to be complete in itself. While there are numerous common sections operative, whichever Plan may be selected, the differences between the several Plans are vital and each constitutes a distinct and well understood type of municipal government. In construing such an instrument, when adopted by any given city, with reference to special statutes theretofore enacted as to such city, it must be assumed that the new charter is intended to be exclusive in its field, and that earlier acts, so far as inconsistent

with its terms, are deemed to be repealed. That design is expressed in unmistakable words in Part I, § 11, where it is provided that the plan adopted shall "supersede the provisions of its charter and of the general and special laws relating thereto and inconsistent herewith." As to the matter here in question there is no room for the application of the principle to which resort sometimes is had to determine whether a general law repeals by implication repugnant special acts applicable to a particular city. In such cases it has been said that strong terms are required in the general act to work a repeal of the special act. *Brown* v. *Lowell*, 8 Met. 172. *Copeland* v. *Mayor & Aldermen of Springfield*, 166 Mass. 498, 504.

The new charter adopted by the voters of Cambridge makes explicit provision, in Part III, § 6, of c. 267, for the removal of such an officer as the commissioner of public safety, in these words: "The mayor may, with the approval of a majority of the members of the city council, remove any head of a department or member of a board before the expiration of his term of office, except members of the school committee, officials appointed by the governor, and assessors where they are elected by vote of the people."

It is urged that this section is not applicable to the removal of the commissioner of public safety because of Part I, § 5.* But that section has nothing to do with removals from office. It relates only to the organization of the various departments and

---

\* Section 5. Until superseded under the provisions of this act, the organization of the executive and administrative departments, and the powers and duties of the officers and employees of any city adopting any of the plans provided for in this act, and the fiscal year of such city shall remain as constituted at the time of the adoption of such plan; but the mayor and city council or other legislative body may at any time by ordinance, not inconsistent with general laws, reorganize, consolidate, or abolish departments, in whole or in part; may transfer the duties, powers and appropriations of one department to another, in whole or in part; may establish new departments; and may increase, reduce, establish or abolish salaries of heads of departments or members of boards. Nothing in this section contained shall authorize any action in conflict with the civil service law and the rules and regulations made thereunder.

The petitioner was appointed commissioner of public safety on July 10, 1912, for a term of five years.

to their duties and powers, and to the authority respecting them vested in the city council. A continuance of the executive and administrative organization of a municipality until the newly created legislative body shall establish a different organization does not mean that another definite and general provision of the act, as to removals, shall remain inoperative either indefinitely or until the terms of office of all those subject to the power of removal shall have been terminated in one of the ways existent at the time they entered into the office.

It further is argued that the power of removal of St. 1912, c. 611, § 2, is preserved in the mayor by reason of Part I, § 11, of c. 267, St. 1915.* But this contention cannot be supported. The word "officers" in that section manifestly refers to the elective officers who are dependent upon the suffrages of the voters, and does not refer to appointive officers, whether heads of departments or members of boards, Part I, § 1, or others who are not chosen by the voters. The correctness of this view is made certain by the references in the latter part of that section to the general city election and to the time when the terms of office begin. These elective officers provided for by the Plan B, adopted by Cambridge, are the mayor, the members of the city council, Part III, §§ 3 and 4, and the school committee, Part I, § 31. The commissioner of public safety is not among them.

The requirement of § 11 of Part I, that the provisions of St. 1915, c. 267, shall supersede the provisions of special acts inconsistent therewith, indubitably repeals the method of removal of the commissioner of public safety set forth in the special act by which that office was created, and renders it subject to the pro-

---

* Section 11. If a majority of the total number of votes cast at a regular state election for and against the adoption of one of the plans of government provided for in this act shall be in favor of its adoption, the provisions of this act, so far as applicable to the form of government under the plan adopted by the city, shall supersede the provisions of its charter and of the general and special laws relating thereto and inconsistent herewith, but not, however, until officers provided for under such plan shall have been duly elected and their terms of office shall have begun. The officers provided for under the plan so adopted shall be elected in accordance with the provisions of this act relating to such plan and in accordance with the provisions of section fifteen of this part, and their terms of office shall begin at ten o'clock in the forenoon of the first Monday of January following their election.

visions as to removal of officers contained in the new charter. It is inconsistent with the general terms of the new charter, to the effect that "the mayor may, with the approval of a majority of the members of the city council, remove any head of a department," Part III, § 6, that the removal of one of the most important heads of departments should continue to be subject to removal by the mayor alone. The circumstance that the petitioner was not appointed under the provisions of the new charter affords no ground for inferring that he may not be removed according to its terms. *Murphy* v. *Mayor of Boston,* 220 Mass. 73, 75.

Simplicity and uniformity of city charter provisions relating to executive functions are so highly desirable, and tend so strongly to efficiency of administration, that unequivocal words would be required to express a legislative purpose to extend into the field of a new city charter an inconsistent provision of an earlier special act. Such words are quite lacking in the present act. Whatever may be said in favor of strong executive power centralized in the mayor, such considerations have no application to a municipality whose voters have deliberately chosen a form of charter, which in this respect divides power and responsibility between the mayor and the city council.

Mandamus is an appropriate remedy. The commissioner of public safety of the city of Cambridge, being by law the head of the department into which the police and fire departments have been consolidated, is an officer whose tenure and method of removal affects intimately the public service. Under all the circumstances here disclosed, there appears to be so near a relation to municipal interest that the writ of mandamus may be invoked to secure the proper execution of the laws. *Attorney General* v. *Boston,* 123 Mass. 460, 471 to 477. *Sinclair* v. *Mayor of Fall River,* 198 Mass. 248, 256. *Rawson* v. *Mayor of Boston,* 193 Mass. 537. *Welch* v. *Swasey,* 193 Mass. 364, 377.

                                        *Writ to issue.*