CHARLES L. GILLIATT & others *vs.* CITY OF QUINCY & others.

Norfolk.     October 10, 1935. — October 17, 1935.

Present: RUGG, C.J., PIERCE, FIELD, LUMMUS, & QUA, JJ.

*Municipal Corporations*, City charter, City wards.     *Statute*, Repeal. *Quincy*.

On adoption by the city of Quincy of a Plan A charter under a statute now part of G. L. (Ter. Ed.) c. 43, its former charter (St. 1888, c. 347, as amended) was superseded, and by force of what is now § 6 of said c. 43 its city council no longer had the power given by § 3 of the former charter, to change the number of wards into which the city was divided; nor was such power conferred by G. L. (Ter. Ed.) c. 54, § 1.

PETITION, filed in the Superior Court on May 29, 1935.

The case was heard by *Donnelly*, J., by whose order a final decree dismissing the petition was entered. The petitioners appealed.

*E. B. Austin*, for the petitioners.

*J. D. Smith*, City Solicitor, (*R. P. Gilman* with him,) for the respondents.

RUGG, C.J. This is a petition by ten or more taxpayers under G. L. (Ter. Ed.) c. 40, § 53, seeking to restrain the expenditure of money to carry out orders and votes of the city council purporting to change the wards of the city of Quincy (hereafter called the city) from six to eight and to increase the number of precincts. The case was submitted upon an agreed statement of facts. Thus it appears that the city was governed by St. 1888, c. 347, and acts in amendment thereto, as its first city charter, until in November, 1916, it adopted a new city charter, fully operative on the first Monday of the following January, known as Plan A, pursuant to St. 1915, c. 267, Parts I and II. Those provisions are now embodied in G. L. (Ter. Ed.) c. 43, §§ 1–55, to which reference will be made: in §§ 1–45 are general provisions applying to all plans of city charters

prescribed in the chapter; in §§ 46–55 are the distinctive features known as Plan A. By St. 1888, c. 347, § 3, it was enacted that the territory of the city should first be divided into six wards, "but said number, upon any subsequent division of said city into new wards, may be increased by an affirmative vote of a majority of the members of the city council passed previous to and in the year of such new division." By the new charter (G. L. [Ter. Ed.] c. 43, § 6; St. 1915, c. 267, Part I, § 6), "The territory of a city adopting any of the plans of government provided for in this chapter shall continue to be divided into the same number of wards existing at the time of such adoption, which shall retain their boundaries until changed in accordance with general law." In G. L. (Ter. Ed.) c. 54, relating to "Elections," are these provisions: § 1. "In nineteen hundred and twenty-four, and every tenth year thereafter, in December, a city, by vote of its city council, may make a new division of its territory into such number of wards as may be fixed by law"; directions for the division of wards into voting precincts are contained in § 2; and by § 3, "On or before the first Monday of July in the year following a redivision of a city into wards, the aldermen shall divide such city into voting precincts, conformably to the preceding section."

The main question raised on this petition is whether the city council of the city was empowered in December, 1934, to increase the number of wards from six to eight. The answer to that question depends on the inquiry whether § 3 of St. 1888, c. 347, already quoted, remained in force after the adoption of the new charter and the organization of the city government in accordance with its terms. The statute describes the effect of the adoption of the new charter in these words: ". . . this chapter, so far as applicable to the form of government under the plan adopted by the city, shall supersede the provisions of its charter and of the general and special laws relating thereto and inconsistent herewith . . . ." G. L. (Ter. Ed.) c. 43, § 11. St. 1915, c. 267, Part I, § 11.

The adoption by the voters of the city of the Plan A

charter was the equivalent of the enactment of a new charter by the General Court, although under a general instead of a special law. The new charter is complete in itself; it is intended to be exclusive in its field. All earlier statutes, so far as inconsistent with its terms, are deemed to be repealed. All that has been theretofore enacted is revoked except as preserved in the new charter. The enactment of a new charter for a city is in substance the abolition of the old charter. *Cunningham* v. *Mayor of Cambridge*, 222 Mass. 574, 577. *Dooling* v. *City Council of Fitchburg*, 242 Mass. 599. *Safford* v. *Lowell*, 255 Mass. 220, 224. *King* v. *Mayor of Quincy*, 270 Mass. 185, 187–188.

The number of wards of the city is fixed by § 6 of the new charter, already quoted. That number shall remain the same as at the time of the adoption of the new charter. The number of wards thus established was six. The boundaries of those wards also must be retained until changed in conformity to general law. The boundaries alone, but not the number of the wards, may be changed pursuant to G. L. (Ter. Ed.) c. 54, § 1. There is no general law authorizing an increase in the number of wards in a city. The terms of § 6 of the new charter establishing the number of wards at six by requiring that the territory of the city "shall continue to be divided into the same number of wards existing" at the time of the adoption of the new charter are incompatible with the continuance of the discretionary power to increase the number of wards vested in the city council by § 3 of the old charter. That field is covered by § 6 of the new charter. Nothing in the new charter preserves that power to the city council. It was abrogated by the adoption of the new charter. No authority is conferred by the new charter to increase the number of wards. Plainly, it was within the competency of the General Court to alter or modify the earlier by the later charter in this particular. *Sullivan* v. *Lawson*, 267 Mass. 438. The effect of § 6 rightly construed is that, when a city adopts any one of the plans set forth in G. L. (Ter. Ed.) c. 43 (St. 1915, c. 267), the number of wards in such city becomes fixed

permanently at the number then existing, until the General Court shall authorize a change.

Under the new charter, "None of the legislative powers of a city shall be abridged or impaired by this chapter; but all such legislative powers shall be possessed and exercised by such body as shall be the legislative body of the city under this chapter." G. L. (Ter. Ed.) c. 43, § 3. St. 1915, c. 267, Part I, § 3. This section does not continue in effect the power vested in the city council by § 3 of the old charter to increase the number of wards. It confers general powers upon the various bodies possessing legislative functions designated in the several plans set forth in the chapter. An explicit mandate of this nature may have been thought wise in view of the diversity of plans embodied in the chapter, some of them being novel in the history of municipal administration in this Commonwealth. By Plan C a commission form of government is created and by Plan D the city manager form of government is created, in each of which are only four members of the city council besides the mayor. It is not necessary to delimit the scope of this section, nor to determine the precise nature of a division of a city into wards. *Fitzgerald* v. *Mayor of Boston,* 220 Mass. 503. See 5 Op. Atty. Gen. 203. It is enough to say that it is general and not specific in terms, and that it cannot overcome the explicit provision in § 6 of the new charter touching the number of wards. Thus interpreted, there is no abridgment or impairment of legislative powers of the city.

There is nothing in G. L. (Ter. Ed.) c. 50, § 6, bearing upon the issue here presented. That section relates solely to G. L. (Ter. Ed.) cc. 51–57, inclusive; it has no relation to c. 43, by which the case at bar is governed.

Other points argued need not be considered. The conclusion is that the division of the territory of the city into eight wards in 1934 was beyond the power of the city council. It was without effect. It follows that the decree dismissing the petition is reversed. On the agreed facts a new decree ought to be entered granting the relief prayed for.

*Ordered accordingly.*