ALFRED P. LOWELL & others *vs.* CITY OF BOSTON & others (and two companion cases [1]).

Suffolk. February 3, 4, 1948. — May 17, 1948.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & WILLIAMS, JJ.

*Boston Common. Parks. Municipal Corporations*, Parks, Charitable trust. *Trust*, Charitable trust. *Dedication. Real Property*, Dedication. *Devise and Legacy*, Charitable trust, Codicil. *Words*, "Hope and expectation."

Upon documentary evidence introduced at a full hearing upon the merits of petitions in equity presenting for determination the nature of the ownership of Boston Common, a finding was required that the title to the Common was in the city of Boston, not subject to any trust, but subject to a dedication of the Common to use by the public as a public park.

Boston Common and the rights of the public to use it as a public park are subject to the paramount authority of the General Court.

Upon evidence only of preliminary sketches and tentative plans furnishing a rough outline of a garage proposed to be constructed under Boston Common pursuant to authority given by St. 1946, c. 294, it could not be assumed that the garage would be located, constructed and operated without reasonable regard to the use of the Common by the public.

---

[1] The companion cases are by Myron E. Pierce and others against the City of Boston and by Anna C. McCarthy and others against the City of Boston.

It was within the competency of the General Court to enact St. 1946, c. 294, which, after declaring that the congestion of the public ways of Boston caused by increased use of motor vehicles and parking of them in such ways had become a public nuisance which could not be abated except by the construction and maintenance of a garage under the Boston Common, authorized the city of Boston, acting through its park department with the approval of the mayor, to contract with a private corporation for the construction and operation, at the expense of the corporation and without cost to the city, of a garage under a certain portion of Boston Common, with necessary approaches and entrances, and to give a lease to the corporation for such purposes for not more than forty years at a certain minimum rent, with appropriate requirements for preservation or restoration of the gardens, lawns, trees and shrubs, even if comparatively small areas of the surface of the Common would be withdrawn from public use at the places of ingress to and egress from the garage.

A new plan adopted by a codicil to the will of George Francis Parkman differed from that in the will only with respect to particular pieces of land to be maintained and improved by the city of Boston as parks from the income of a bequest in trust; the testator's intention was that the benefaction for the Boston Common expressed in the codicil should be upon the same terms as those expressed in the will.

A provision in the will of George Francis Parkman that a bequest in trust, which was to be used for the maintenance and improvement "of the Boston Common" was made "in the hope and expectation that the Boston Common shall never either in whole or in part be diverted from the present use as a Public Park for the benefit and enjoyment of . . . citizens" of Boston, did not impose a limitation or condition which constituted an integral and essential part of the trust.

Withdrawal from public use of comparatively small areas of Boston Common for entrances to and exits from a garage constructed thereunder pursuant to the provisions of St. 1946, c. 294, would not constitute a breach of any mandatory and essential provision contained in the trust for the benefit of the Common created by the provisions of the will and codicil of George Francis Parkman.

THREE PETITIONS, filed in the Superior Court respectively on August 23, 1946, September 12, 1946, and February 11, 1947.

The cases were heard together by *Hanify*, J., who made certain findings and reserved and reported the cases for determination by this court.

*J. E. Hannigan*, for the petitioners.

*J. W. Kelleher*, Assistant Corporation Counsel, (*W. H. Kerr* with him,) for the respondents city of Boston and others.

*H. W. Cole,* for the respondent Motor Park, Inc.

*W. C. Madden,* for the petitioners McCarthy and others, submitted a brief.

*F. H. Smith, Jr.,* a petitioner, submitted a brief.

*F. W. Grinnell,* by leave of court, submitted a brief as amicus curiae.

RONAN, J. Lowell and more than ten taxpayers of the city of Boston brought a petition under G. L. (Ter. Ed.) c. 40, § 53, against the city, its mayor and board of park commissioners, and the Motor Park, Inc., a private corporation, to restrain the respondent municipal officials from imposing unauthorized financial obligations upon the city which, it is alleged, will result from entering into a contract with that private corporation, by the park commissioners with the approval of the mayor, as provided in St. 1946, c. 294. The object of the contract will be to construct and operate an underground garage for the parking of automobiles under the Boston Common, with a vehicular tunnel from Commonwealth Avenue under the Public Garden to the garage and an underground passage for patrons and employees from the garage to Tremont Street near West Street. The petition prays for an injunction against leasing the site of the proposed garage to the private corporation, as those officers intend to do. It is also alleged that this proposed use of the Common would be contrary to the terms of certain testamentary gifts which the city has accepted. The city in its answer sought a declaratory decree that St. 1946, c. 294, was valid and that it held an unencumbered title to the Common and Public Garden.

The second petition was brought against the city alone by leave of court by Pierce and not less than ten other taxpayers of the city, alleging that the city holds Boston Common "and its accessory the Public Garden" by a gift made in 1634 to the town for the use primarily by its inhabitants as a Common, and that the city holds the title in a trust relation to those for whose use the land as a Common was provided; and praying that the gift and trust be determined, the purposes of the gift be enforced, and any use

of the land inconsistent with the gift be restrained. The petition as amended alleges that the city accepted a gift under the will of George Francis Parkman, the income of which was to be used for the maintenance and improvement of the Common and parks of the city, and that the city intends to divert the use of the Common to another use which would constitute a violation of its acceptance of the Parkman gift. In this suit the city sought a declaratory decree under G. L. (Ter. Ed.) c. 231A, as inserted by St. 1945, c. 582, § 1, that St. 1946, c. 294, is a valid enactment; that the city is empowered to act under the provisions of said statute; and that the use of Boston Common and the Public Garden by the city is subject only to such restrictions as may be imposed by the Legislature which represents the interest of the general public in the use of said land.

The third petition was brought by McCarthy and others against the city by leave of court under G. L. (Ter. Ed.) c. 214, § 3 (11), to enforce the terms of the George Francis Parkman gift which was given to and accepted by the city. The city denies that the execution of a lease to a private corporation in accordance with St. 1946, c. 294, will impair the obligations imposed on the city by its acceptance of the Parkman gift.

These three petitions were heard together upon oral testimony which related chiefly to the construction and operation of the proposed garage and the manner and extent in which it might affect the Common. The principal evidence, however, which pertained to the origin, history and use of the Common consisted of documentary evidence comprising public records, ancient maps, plans, photographs, various written instruments and historical books. The judge made findings of fact and reported the cases to this court on the pleadings, the evidence, his rulings on evidence and exceptions thereto, and his findings of fact, such decrees to be entered as justice and equity may require. Questions of evidence have not been argued.

The present Common is bounded by Charles Street one thousand three hundred sixty feet, Beacon Street one thousand seven hundred sixty feet, Park Street four hundred

eighty feet, Tremont Street one thousand six hundred eighty feet, and Boylston Street seven hundred sixty feet. Forty-four acres of the original location were acquired from William Blackstone in 1634. A parcel of two and one eighth acres located at what is now the corner of Tremont Street and Boylston Street, known as the Deer Park, which was acquired by the town in 1787, and the parcel adjoining on the west and abutting on what is now Boylston Street, which was purchased by the town in 1756 and used for a burial ground, consisting of one and four tenths acres, were added to the Blackstone land. The land known as the Common in the early days of the Colony extended far beyond its present boundaries. For instance, it extended on the north beyond what is now Park Street and on the east beyond what is now Tremont Street. Its original area has since been diminished but its boundaries have only been slightly changed during the last century, and the changes which have been made during that period have been due principally to the widening of some of the adjoining streets. The present boundaries have long become well established. Old photographs show the existence of fences. The city council of Boston in 1836 voted to erect an iron fence around the Common.[1] For many years a metallic ornamental fence surrounded the Common. A part of that fence is missing. It has been said that a portion of it was contributed to the war effort in the last World War. The area of the Common is forty-eight and forty hundredths acres.

The Public Garden is bounded by Boylston, Arlington, Beacon and Charles streets. The Blackstone grant of 1634 did not include the present site of the Public Garden, but by operation of the Colonial ordinance of 1647 the flats adjoining the Common on the southwest went to the owner of the uplands and included the land now occupied by the Public Garden. The town sold this land in 1794 to be used for the manufacture of rope, and it was repurchased by the city in 1824. The buildings were removed by the city, the land was completely filled, and for nearly a century it has

---

[1] *Veale* v. *Boston*, 135 Mass. 187.

been used for flower gardens, shade trees, walks, statues, and works of sculptural art, all intended for the enjoyment and edification of the public. The area of the Public Garden comprises twenty-four and twenty-five hundredths acres.

George Francis Parkman, a resident of Boston, who died in 1908, by his will left the residue of his estate amounting to approximately $5,000,000 to the city for the purchase and improvement of certain land for a public park, and by a codicil he left the residue of his estate to the city, the income of which was to be applied to the maintenance and improvement of the Common and the existing parks. The gift was accepted by the city and the income totalling approximately $7,500,000 has since been used by the city in accordance with the terms of the will.

The parties are at issue as to the nature of the title to the Common which vested in the town in 1634. The Lowell petition alleged that the town acquired the title to the Common in 1634 from the early inhabitants, who by individual contributions paid William Blackstone for a conveyance of the land, and that the town accepted the title subject to laying out the land as a training field and administering it for the common good of all the inhabitants forever. The Pierce petition alleged that the Common was given to the town in 1634, that the city as successor to the town holds the Common and the Public Garden for the use of its inhabitants and the public as a Common, and that it now holds the title in a trust relation to the people for whose use as a Common the property was provided. The McCarthy petition alleged that the town held from time immemorial only a bare technical title to the land of the Boston Common without any of the incidents of ownership but in trust only for the specific uses and purposes for which it was dedicated. To these allegations the city answered that the town acquired title to the Common in 1634 by purchase from William Blackstone for thirty pounds, which was not obtained from individual contributions of the inhabitants but was raised by taxation, and that the town by the terms of the purchase acquired the land in fee simple subject to no conditions of any kind.

The judge found that the town acquired title in 1634 from its then inhabitants who purchased the land from Blackstone for thirty pounds; that each householder contributed not less than six shillings toward the purchase price, which was raised by a rate as shown by the town's records under date of November 10, 1634; and that after the purchase the town laid out a training field and used the Common for the pasturing of cattle. This finding as to the acquisition of the title is based upon documentary evidence, all of which is before us. The credibility of witnesses is not involved. We stand in the same position as did the trial judge in determining the nature of the title vested in the town. We draw our own inferences from such evidence without deference to those drawn by the trial judge. *Veazie* v. *Staples,* 309 Mass. 123, 127. *Pitman* v. *Pitman,* 314 Mass. 465, 475. *First National Stores Inc.* v. *First National Liquor Co.* 316 Mass. 538, 540. *Fiduciary Trust Co.* v. *Mishou,* 321 Mass. 615, 631.

Enough has been said to show that the parties agree that the town acquired title to the land in 1634, but they are in controversy as to the nature of the title which the town obtained. Whether the town took an unencumbered fee in the land or held it subject to certain public uses is important in determining the rights of the parties, for if the town acquired the land in the latter capacity the terms of the grant must be observed and enforced. *Cary Library* v. *Bliss,* 151 Mass. 364. *Attorney General* v. *Lowell,* 246 Mass. 312. *Adams* v. *Plunkett,* 274 Mass. 453. *City Bank Farmers Trust Co.* v. *Carpenter,* 319 Mass. 78.

The Court of Assistants on April 1, 1633, voted: "It is agreed, that Mr. William Blackstone shall haue 50 ac of ground sett out for him neere to his howse in Boston, to inioy for euer." 1 Mass. Col. Rec. 97. Blackstone according to the town records of Charlestown[1] resided at a place which the Indians called Shawmut, not far from what was then known as Blackstone's Point. No further proceedings under this vote appear in the records of the Court of Assist-

---

[1] Drake, History and Antiquities of Boston, 95, 97.

ants. The title to this land was originally in the Colony, and a grant by the colonial government to an individual was not unusual during the first few years of the existence of the colonial government. "All private property or ownership in land, within the limits of the Colony of Massachusetts, must be derived from a grant of the colonial government. All the lands were first granted by the crown to the Governor and Company of the Massachusetts Bay in New England, and by them were parcelled out to individuals, and, at a later period, to bodies of proprietors, as tenants in common." *Porter* v. *Sullivan*, 7 Gray, 441, 443. *Lynn* v. *Nahant*, 113 Mass. 433, 448. In view of subsequent events it is proper to infer that Blackstone as a consequence of the vote of April 1, 1633, acquired title to a tract of fifty acres of land. In the following year, he sold forty-four acres of this land which now comprises nearly all of the present area of the Common. There is no evidence that Blackstone gave a deed of the land, [1] and the absence of a deed furnishes the occasion for the present controversy in so far as it relates to the capacity in which the city holds the Common.

The petitioners, in support of their contention that the town took the title subject to a trust for the maintenance of the locus as a training field and a cow pasture and in general as a common or public park, rely mainly upon the Odlin deposition. On June 10, 1684, John Odlin and three other "ancient dwellers and inhabitants of the Town of Boston in New England" gave a written deposition before Governor Bradstreet and his assistant, Judge Samuel Sewall. The deponents stated that about 1634 "the then present inhabitants of said Town of Boston," of whom Governor Winthrop was the chief, agreed with William Blackstone for the purchase of his land, "and for said purchase agreed that every householder should pay six shillings which was accordingly collected, none paying less,

---

[1] A transfer of title to land at that time was not always made by a deed. For various ordinances authorizing freemen to dispose of their lands, and the requirement that conveyances be effected by written instruments which should be recorded, see 1 Mass. Col. Rec. 290; Anc. Chart. 85, 86; *Pidge* v. *Tyler*, 4 Mass. 541, 544.

some considerably more, than six shillings and the said
sum collected was delivered and paid to Mr. Blackstone
to his full content and satisfaction, in consideration whereof,
he sold unto the then inhabitants of sd Town and their
heirs & assigns forever, his whole right and interest in all
& every of the lands lying within said Neck, reserving only
unto himself about six acres of land on the point, commonly
called Blackstone's Point, on part whereof, his then dwelling
house stood, after which purchase the Town laid out a
place for a Training Field, which ever since and now is
used for that purpose, and for the feeding of cattle. . . ."
Two of the deponents further stated that Blackstone pur-
chased a stock of cows from the money paid to him and
removed to a place near Providence where he lived until
his death. The deposition was kept in the Court of As-
sistants until it was recorded in the registry of deeds on
February 8, 1708.

At the time of the deposition, relations between the
Colony and the mother country were strained, and the
notorious fact that an unincorporated town had for one
half century maintained the Common as a cow pasture and
a training field might invoke an attack upon its title, if the
charter were dissolved and an unfriendly Governor were
sent here by the Crown to administer the affairs of the
Colony. Indeed, proceedings for the forfeiture of the
charter were pending, and there was great apprehension
that, if the charter were repealed, titles to land would be
questioned and probably held invalid. It was apparently
deemed necessary in these circumstances to obtain the
deposition in order to perpetuate testimony of the Black-
stone grant and to preserve the title to the Common in the
event it should be challenged. The charter was finally
forfeited on October 23, 1684. Andros was sent by James II
to govern New England and arrived in Boston on December
19, 1686. He pretended that all lands had reverted to the
Crown upon the dissolution of the charter. Randolph,
who had been here sometime before the arrival of Andros,
as an official observor for the Crown, petitioned for a house
lot of one half acre of land on the Common. After the

abdication of the King in 1688, Andros was banished, but the apprehension concerning the security of titles granted by the colonial government did not subside until the Province charter dated October 7, 1691, confirmed them. It is in this setting that the Odlin deposition is to be interpreted. It is the version of four elderly inhabitants of the town of the sale of his land by Blackstone given fifty years after the transfer. This ancient document was prepared and executed for the purpose of perpetuating evidence of the transfer of the Blackstone land and its recital of facts was competent evidence of the truth of those facts, but they were to be considered with the facts appearing from other ancient writings and circumstances connected with the transfer of the land. *Sparhawk* v. *Bullard*, 1 Met. 95, 101. *Berry* v. *Raddin*, 11 Allen, 577, 579. *Morris* v. *Callanan*, 105 Mass. 129. *Drury* v. *Midland Railroad*, 127 Mass. 571, 581. *Randall* v. *Chase*, 133 Mass. 210. *Whitman* v. *Shaw*, 166 Mass. 451.

The grantees of Blackstone were, according to the deposition, the then inhabitants of the town and their heirs and assigns. This would indicate that they took as tenants in common. *Bates* v. *Cohasset*, 280 Mass. 142, 147. There is, however, considerable evidence tending to show that the town itself was the grantee. It may well be that in 1634 there was much doubt whether the town had capacity to accept a grant and it might have been thought expedient that the grant should run to the inhabitants rather than to the town, although it appears from the history of the development of our early towns that they soon after their settlements became in effect quasi corporations capable of receiving and disposing of land, although no act of incorporation was passed until after the close of the colonial government. *Porter* v. *Sullivan*, 7 Gray, 441, 444. *Commonwealth* v. *Roxbury*, 9 Gray, 451, 485. *Hill* v. *Boston*, 122 Mass. 344, 349. See also *Worcester* v. *Eaton*, 13 Mass. 371, 378; *Commonwealth* v. *Wilder*, 127 Mass. 1, 3–4. In any event the town acquired title either directly from Blackstone or from its inhabitants.

Much light upon the Blackstone transfer is furnished by

the records of the town and its conduct in managing the land. At the second meeting of the town which was held on November 10, 1634, it was voted that five named persons "shall make and assess all these rates, vizt., a rate of 30 lb. to Mr. Blackston, a rate for the cowes keeping, a rate for the goates keeping and other charges in rambe goats about them and for losse in common and to make a rate for the young cattle and cowskeeper at Muddy River." [1] This vote was passed at about the time of the Blackstone conveyance and probably shortly before it. So far as appears, Blackstone had no transaction with the town pending at the time of this vote other than the sale of his land. The plain implication of this vote is that Blackstone had agreed to sell and the town to buy the land for thirty pounds and that the town in order to complete the purchase had voted to raise the money by taxation and to establish rates for pasturing after it had acquired the land. The town itself intended to buy the land and to receive the revenue from its use. It may be that the price was agreed upon as a result of the negotiations conducted in behalf of the inhabitants by Governor Winthrop and his associates with Blackstone as recited in the deposition. This vote was passed six months after Winthrop had been succeeded by Dudley as Governor. [2] It is improbable that the inhabitants who attended the town meeting of November 10, 1634, did not know of these negotiations. It is unlikely that they would vote to have the town pay thirty pounds to Blackstone if the land could be acquired without any cost to the town. It is true that no further proceedings are recorded as to the assessment and collection of the amount named, but it is also true that the books of the town showing the receipt of money are not now existent. We do not know the amount of the assessment levied on each householder, and it may be that the amounts ranged upward from six shillings as stated in the deposition. If the purchase price was voluntarily raised by the householders who contributed different amounts, there is nothing

---

[1] Boston Town Records, 2. References to those records are to the pages as they appear in Second Report of Record Commissioners, 1877.

[2] Thomas Dudley became Governor on May 14, 1634. 1 Mass. Col. Rec. 114.

to show that they received any fractional interest in the land corresponding to the proportion in which they contributed to the purchase price. The acquisition of private fractional interests in the land was not the purpose of the purchase. It was a collective undertaking for the benefit of and in behalf of the town, and if the householders were the grantees of Blackstone they could have had Blackstone transfer the land to the town or they themselves could have transferred it to the town itself, for the settlement had already been regarded and recognized as a town. This settlement had been named Boston on September 7, 1630, 1 Mass. Col. Rec. 58; taxes had been levied upon it together with the several other towns; and its boundaries with some of the adjoining towns had been fixed before the Blackstone transfer. 1 Mass. Col. Rec. 81, 84, 96, 104. No record of any conveyance from such grantees appears, and no contention is made that there ever was such a record. Neither is there any record that they acting as individual owners conveyed the land to themselves as a collective body representing the town or to themselves as inhabitants of the town, its successors or assigns. The town acquired ownership of the land, and if its title came from the grantees of Blackstone and not from him directly to the town the burden was on the petitioners to prove it.

Technical refinements and common law distinctions as to title are not to be given too much weight in determining the origin of the ownership of the Common, depending as they do upon events which occurred more than three centuries ago during the incipient and formative stages of a young settlement striving to organize itself into a permanent political subdivision; and whether the ownership was in the town or in its inhabitants, the latter, in those early days, as owners or as freemen, controlled the property, its title and its use. The rights of no strangers were involved. It was said by Shaw, C.J., in *First Parish in Shrewsbury* v. *Smith*, 14 Pick. 297, 301, "There is great difficulty in applying the strict rules of common law conveyancing, to the early acts and votes of proprietors, towns and parishes, in the colony and province of Massachusetts, without danger

of producing some confusion of rights; and the fact probably was, that towns, parishes and proprietors, often consisted so nearly of the same individuals, that a grant or appropriation of one of these bodies to another was little more than an appropriation by themselves in one capacity, to the use of themselves in another; from which it probably followed, that less attention was paid to such acts, than if they had been acts of alienation to strangers." See *Lakin* v. *Ames*, 10 Cush. 198; *Wrentham* v. *Norfolk*, 114 Mass. 555; *Easton* v. *Drake*, 182 Mass. 283. There is nothing in the evidence, including the numerous exhibits, tending to show that the inhabitants as private individuals ever asserted any private right in the land. Every recorded action taken by such of the inhabitants as were qualified to participate in the various town meetings is persuasive evidence that they always dealt with the land as if it were the sole property of the town, and in voting at these meetings with reference to the Common they acted not individually as private owners but collectively as freemen of the town in supervising and managing the property and the affairs of the town.

If the town accepted the land under a trust to lay out a training field, it is to be noted that the vote at the town meeting of November 10, 1634, made no mention of a training field or anything from which it could be inferred that the town had become obliged to lay out a training field upon the Common. A training field was an actual necessity at a time when the Colony was actively engaged in building fortifications, arranging for supplies of arms and ammunition, and selecting persons who were to be charged with the defence of the Colony in case of war. 1 Mass. Col. Rec. 122, et seq.

The inhabitants soon after the acquisition of the Blackstone land began to demand a division of land among themselves. They were fearful that they might not fare as well if the division was left to the group of the leading citizens who had usually conducted the affairs of the town, so they selected their committee by written ballots. Winthrop was one of those selected, but he was unwilling to serve with the others selected and protested the failure to

select the men who had served the inhabitants so well in other matters. A clergyman read from the Scriptures and drew the lesson that the affairs of the town should be conducted by the old and experienced leaders. This gathering of the inhabitants adjourned for a week; and when they assembled at a town meeting on December 18, 1634, they rescinded their previous vote and passed a new vote appointing Winthrop and his associates with power to divide and dispose of all lands belonging to the town as were not in the lawful possession of any particular person "to the inhabitants of the towne according to the Orders of the Court, leaving such portions in Common for the use of newe Commers, and the further benifitt of the towne, as in theire discretions they shall thinke fitt." [1] The importance of this meeting is that the inhabitants were demanding a division of their common lands including the Blackstone land. It is incredible that, if the land had been donated to the town for specific public purposes, the inhabitants would ignore these purposes and demand a share of the land for their own personal use, or that Winthrop, who knew all the details of the purchase of the Blackstone land, would not have immediately answered their demands by insisting that the town could not legally dispose of the land or permit its division. So far as appears, he took no such position, and the vote itself did not prohibit a division but left the matter open for a future new division among new residents and for the advantage of the town as the committee should deem expedient.

At a meeting on March 30, 1640, of Winthrop and five others, it was according to the town records "agreed upon that henceforth there shalbe noe land granted eyther for housplott or garden to any person out of the open ground or Comon Feild Which is left betweene the Centry Hill and Mr. Colbrons end; Except 3 or 4 Lotts to make up the streete from bro. Robte Walkers to the Round Marsh." [2]

---

[1] 1 Winthrop's Journal (Savage ed.) 151. Shurtleff, A Topographical and Historical Description of Boston, 298–300. Boston Town Records, 3.

[2] That this vote concerned land included in the Common seems plain. Shurtleff, A Topographical and Historical Description of Boston, 298–300. The street mentioned in the vote is Boylston Street. Centry Hill named on

If the land had been dedicated by its owners for a training field or a cow pasture, or if it had been transferred to the town for these purposes, there would seem to have been no need of a vote for the purpose of preventing the sale of the land. The exception of the three or four lots would indicate that they were regarded as part of the Common. If the land had been dedicated or transferred as above mentioned, the committee would have had no right to authorize the sale of the three or four house lots referred to in the vote. In either event, the vote was consistent only with a transfer of the land to the town free from restrictions. Winthrop must be assumed to have been familiar with the transaction. If the town acquired the land for a training field and a cow pasture, he could hardly have been expected to vote in favor of permitting a part to be sold for house lots.

The town of Boston between 1640 and 1760, as shown by various exhibits, authorized the execution of a dozen leases of various parts of the Common, reserving the rent to itself. The terms of some of these leases were terminable by three months' notice while others were for several years. The town voted in 1795 to sell two parcels of land for the purpose of raising revenue. One parcel was located on the easterly side of Tremont Street and extended back to Mason Street, and the other was located on what is now the northerly side of Park Street and was occupied for an almshouse and workshop. The first parcel appears from ancient maps to have been originally a part of the Common and by later maps to have been separated from the Common between 1722 and 1795, perhaps by the extension of Common Street, as it was then called, to form Tremont Street. The use and occupation of the second parcel are shown by the records of the town. The town voted on November 5, 1660, to authorize the selectmen to erect an almshouse upon "a piece of ground in the comon." [1] The town meeting

account of a signal pole upon its summit, 1 Mass. Col. Rec. 138, was later known as Beacon Hill which formerly stood in the rear and north of the present site of the original building of the present State House. The location of Colbrons's and Walker's dwellings is shown on Lamb's Maps of 1630, 1635, 1640, and 1645. See *Sparhawk* v. *Bullard*, 1 Met. 95, note at 98. Boston Town Records, 52.

[1] See Boston Town Records, 158.

held on July 27, 1739, accepted the report of a committee previously appointed that the workhouse had been built "at the upper end of the Common." The voters at the town meeting of March 10, 1772, voted to abate the nuisance on the Common which was caused by the overflow of the vaults of the almshouse and the workhouse. The sum of $23,000 was realized from the sale of these two parcels and was used by the city to construct a new almshouse and other buildings. The judge found that both parcels were included in the land sold by Blackstone but that neither parcel was included within the present area of the Common.

Definite recognition of the city's title to the Common was given by the Legislature by the provisions contained in the original charter, which was drafted by Lemuel Shaw and others, and in the amended charter, to the effect that the city council should have "the care, custody, and management of all the property of the city, with power to lease or sell the same, (except the Common, and Faneuil Hall,) . . . ." St. 1821, c. 110, § 16.[1]   St. 1854, c. 448, § 39.

When the necessity for further use of the Common for a training field ceased, and when it became impracticable about 1830 to permit the pasturing of cows, the municipality developed the Common, and also the Public Garden when it regained ownership in 1824, into beautiful well kept parks ideally equipped for the rest, recreation and enjoyment of the public. The judge found that "It is a matter of notoriety that from ancient time, commencing near the first settlement of the Town, the Common had always been kept as a Common and freely used for military training and as a place of general resort for the occupation of all the people. . . . Ancient maps show a space now in controversy designated by the name 'Common.' . . . It is alleged and admitted that 'for about three centuries the inhabitants as a community, as individuals, families, groups, companies, regiments, audiences have sought and found rest, recreation, edification and inspiration on the Common,' and that 'to adapt the Common to these uses, groves and rows of shade trees have been planted and cultivated,

---

[1] The charter was accepted in 1822.

lawns prepared, settees and comfortable benches provided, walks and paths opened, areas laid out for games, parades and pageants. Monuments and courts of honor to the Heroic Dead of the Town and City have been set up. In time of war, it is the centre of patriotic activity.' For more than one hundred years the Common was enclosed with a fence, part of which still stands." With reference to the Public Garden, he found that after the city reacquired title to it "This part of. the Common then became available for all those public uses which were the original objects of the dedication. And now for nearly a century the Public Garden has been used for flower gardens, shade trees, walks, statues, works of sculptural art, all intended for the enjoyment and edification of the public. A graceful bridge crosses a picturesque pond."

The record contains an exhaustive history of the Common from the earliest colonial times to the present, with ancient maps, plans, town records, deeds, layout of streets, frequent references to historical works, old photographs, and various other documents. Due to the diligence and industry of counsel, it seems probable that no writing of any materiality has been omitted from the mass of exhibits which have been introduced in evidence. It is the first time, so far as we are aware, that the nature of the city's title to the Common has been fully tried. In our previous decisions, it was not necessary to ascertain the precise interest of the municipality in the Common; and when the question became material, it was considered entirely upon the assumption that the allegations contained in various pleadings with reference to title were true. See *Steele* v. *Boston,* 128 Mass. 583; *Veale* v. *Boston,* 135 Mass. 187; *Commonwealth* v. *Davis,* 140 Mass. 485; *Lincoln* v. *Boston,* 148 Mass. 578; *Prince* v. *Crocker,* 166 Mass. 347; *Codman* v. *Crocker,* 203 Mass. 146; *Commonwealth* v. *Gilfedder,* 321 Mass. 335.

This brief summary of the history of the Common furnishes strong and persuasive evidence that the town bought and paid for the Blackstone land and received the fee from him free from restrictions.

We pass to the question whether the town took the land subject to a trust. Two previous suits by taxpayers to prevent alleged encroachments upon the Common and the Public Garden by the location of subways therein came before this court in *Prince* v. *Crocker*, 166 Mass. 347, and *Codman* v. *Crocker*, 203 Mass. 146. In the first case it was stated at pages 362, 363, that it was not necessary "to go into any nice consideration of the precise capacity, interest, or duty of the city in caring for the Common or Public Garden, because both the Legislature and the city have consented to such new use of both as may be included within the terms of the statute," or to "pursue the questions relating to the title to and interest of the public in public parks . . . ." In the second suit, it was stated at pages 148, 149, that the principal question is "whether the Legislature had constitutional authority to provide for the construction of such a tunnel under a part of Boston Common, in view of the uses to which the Common was dedicated by its owners in 1634. It is averred in the bill that it was then set apart 'for the common use of the inhabitants of Boston as a training field and cow pasture.' No further particulars of the dedication are stated in the bill, but it has been held repeatedly that the legal title to the property vested in the town of Boston as a municipality, for the public uses referred to in the language above quoted. The city of Boston has succeeded to the town, and it holds the land for these public uses. . . . As the holder of the title, it is in a kind of trust relation to the people for whose use the property was provided." This later decision must be considered with reference to the basis upon which it was rendered. An examination of the record in that case shows that the case was reserved for determination by this court upon the petition and so much of the answers as were by way of demurrer, and the question presented was whether the allegations in the petition were sufficient to maintain the suit. The petition alleged that the Boston Common was purchased in 1634 from William Blackstone by Governor Winthrop and others, and was set apart " 'for the common use of the inhabitants of Boston as a training

field and cow pasture'; that the title thereby became vested in the inhabitants of the town of Boston as tenants in common; that since the incorporation of the city the said Boston Common has always been owned by the city in its corporate capacity, and has been used by the inhabitants of the city as an open playground and park; that no portion of the Common has ever been taken or appropriated to any other use, except by the consent of the said city of Boston." These allegations were taken to be true for the purpose of ruling on the demurrer. Not a single piece of testimony relative to the title was or could be introduced. This court assumed in accordance with the usual practice that the truth of these allegations was admitted by the demurrer and decided the suit upon that basis. Whether the town accepted the land subject to a trust was not presented or decided. No question of title or trust was adjudicated. An opinion must be construed with reference to the facts which were found and the issues presented and it is not an authority for any proposition not considered or determined. *Swan* v. *Justices of the Superior Court,* 222 Mass. 542, 545. *Cawley* v. *Northern Waste Co.* 239 Mass. 540, 544. *Millett* v. *Temple,* 280 Mass. 543, 551. *Forbes* v. *Kane,* 316 Mass. 207. *Henderson* v. *Mayor of Medford,* 321 Mass. 732, 735. The *Codman* case assumed in accordance with the allegations in the pleading that the town took title subject to a trust. It did not decide after a hearing on the merits that the title was so held. Subsequent expressions in *Higginson* v. *Treasurer & School House Commissioners of Boston,* 212 Mass. 583, 587, and *MacDonald* v. *Board of Street Commissioners of Boston,* 268 Mass. 288, 296, stemming from *Codman* v. *Crocker,* to the effect that that title was conveyed subject to a trust, have no more binding effect than they had in the case just mentioned. Incidentally, in passing, it is to be observed that the *Prince* and *Codman* cases decided that the location of a subway in the Common would not constitute a breach of trust upon the part of the city.

The contention is pressed that the purchasers from Blackstone were the then inhabitants of the town, their heirs and

assigns, as narrated in the Odlin deposition, and that they dedicated the land to the town for the purpose of maintaining it for certain public purposes. It is doubtful whether the principle of dedication was recognized here in 1634, *Hinckley* v. *Hastings,* 2 Pick. 162, *Commonwealth* v. *Low,* 3 Pick. 408, *Hobbs* v. *Lowell,* 19 Pick. 405; and in the next place, if it was, dedication would involve no transfer of title by the owners but only the creation of an easement for the benefit of the general public. Mere dedication of the land cannot possibly furnish any adequate explanation of the manner in which the parties dealt with it. The fact is that the record fails to show that these grantees — assuming that there were such — held the land for any appreciable time during which they dedicated it to any public uses and then transferred it to the town subject to these uses. The town came into possession of the land in 1634. During the more than three centuries in which the town or the city has managed and controlled the Common, it has never recognized the private right of any individual in the locus, and so far as appears no one has ever challenged any act of the municipality on the ground that it interfered with or impaired any proprietary interest of his in the land. See *Browne* v. *Bowdoinham,* 71 Maine, 144; *Trustees of the Freeholders & Commonalty of East Hampton* v. *Vail,* 151 N. Y. 463. Indeed, as already pointed out, no contention is made that the title to the land did not vest in the municipality.

It is next urged that the land was donated by the purchasers from Blackstone, as described in the Odlin deposition, for its maintenance for certain public purposes. This deposition does not mention the conveyance of any land other than the conveyance from Blackstone. The laying out of a training field by the town and the maintenance by the town of a cow pasture are mentioned. It is significant that no mention is made of the transfer or the lack of any transfer of title to the town in fee or in trust, nor, indeed, is there a single word explanatory of the circumstances in which the town acquired possession and occupancy of the Common, especially in view of the fact that this deposition was made for the purpose of protecting the title to the Common against

the representatives of the Crown who, it was anticipated, would claim the land as belonging to the Crown. The relation of the town to the land is not stated or defined in the deposition, and so far as the deposition itself goes the occupancy by the town might be permissive without any right, title or interest in the land, or it might be in the exercise of rights of ownership therein. Furthermore, there is not the slightest intimation in the deposition that whatever the town did upon the land was performed in accordance with any agreement the town had entered into with anyone or in carrying out any obligation it assumed in taking possession of the land. Indeed, it was stated as late as 1840 in *Sparhawk* v. *Bullard*, 1 Met. 95, in a footnote at page 98, that "It has been supposed by some that the original reservation [of Boston Common] was by Blackstone, the first proprietor of the peninsula, now the city of Boston." We need not decide whether the meager reference in the deposition to the use which the town made of the land would be sufficient, if it stood alone, to prove the creation of a trust, because we are of the opinion that, when considered and weighed with the other documentary evidence and the circumstances in which the inhabitants, acting collectively as the town itself, dealt with the land, this reference in the deposition would not justify a conclusion that the land was charged with a trust when its ownership was acquired by the town. It is one thing to determine whether the terms and provisions of a transfer constitute a transfer in trust. It is quite another matter to determine whether a trust was created by a conveyance of land from an inspection of the deposition which does not set forth any terms or provisions of any conveyance and in fact does not make any reference whatever to any conveyance. In view of all the evidence we are of opinion that the petitioners have failed to prove that the town took the land subject to any trust.

While we are of the opinion that title to the Common vested in fee simple in the town free from any trust, we do not agree with the respondents that the city now possesses title free from any restriction, for it is plain that the town has dedicated the Common and the Public Garden to the

use of the public as a public park.[1] A municipality may dedicate land owned by it to a particular public purpose provided there is nothing in the terms and conditions by which it was acquired or the purposes for which it is held preventing it from doing so, *Attorney General* v. *Tarr*, 148 Mass. 309; Tiffany, Real Property (3d ed.) § 1100; and upon completion of the dedication it becomes irrevocable. *Hayden* v. *Stone*, 112 Mass. 346, 350. *Longley* v. *Worcester*, 304 Mass. 580, 588. The general public for whose benefit a use in the land was established by an owner obtains an interest in the land in the nature of an easement. *Wright* v. *Tukey*, 3 Cush. 290. *Attorney General* v. *Abbott*, 154 Mass. 323. *Attorney General* v. *Vineyard Grove Co.* 181 Mass. 507. *Attorney General* v. *Onset Bay Grove Association*, 221 Mass. 342. The rights of the public in such an easement are subject to the paramount authority of the General Court which may limit, suspend or terminate the easement. It was stated in *Wright* v. *Walcott*, 238 Mass. 432, 435, that "Land acquired by a city or town by eminent domain or through expenditure of public funds, held strictly for public uses as a park and not subject to the terms of any gift, devise, grant, bequest or other trust or condition, is under the control of the General Court. It may be transferred to some other agency of government or devoted to some other public use by legislative mandate. The power of the General Court in this regard is supreme over that of the city or town. When title in fee is acquired in the land by the municipality for such a public use, there is no right of reversion to the original owner. He has been divested of every vestige of title when he parted with the fee." Although, as already pointed out, the decision in *Codman* v. *Crocker*, 203 Mass. 146, was based upon the assumption that the Common was dedicated by its owners as a training field and a cow pasture, it was said at page 153 "that the title of the city is held only in its municipal capacity as an agency of the government for the benefit of the public, and that the power of

---

[1] See G. L. (Ter. Ed.) c. 45, § 7, providing for the maintenance forever of certain parks by cities and towns and prohibiting the erection of structures thereon. See also G. L. (Ter. Ed.) c. 79, § 5, relative to the laying out of ways over public parks.

the Legislature to represent this interest is supreme." See also *Wrentham* v. *Norfolk*, 114 Mass. 555; *Agawam* v. *Hampden*, 130 Mass. 528; *Higginson* v. *Treasurer & School House Commissioners of Boston*, 212 Mass. 583.

The city holds the title to the Common and the Public Garden in a corporate capacity as an agency of government as distinguished from a private or proprietary capacity. It has long been settled that parks and commons are held and maintained by municipalities not as private owners for their own particular uses but for the benefit of all members of the public who might have occasion to resort to them. *Oliver* v. *Worcester*, 102 Mass. 489. *Wrentham* v. *Norfolk*, 114 Mass. 555. *Holt* v. *Somerville*, 127 Mass. 408. *Clark* v. *Waltham*, 128 Mass. 567. *Attorney General* v. *Abbott*, 154 Mass. 323. *Commonwealth* v. *Abrahams*, 156 Mass. 57. *Higginson* v. *Treasurer & School House Commissioners of Boston*, 212 Mass. 583. The instant cases are readily distinguishable from those where the city possesses property in a proprietary capacity and where its ownership must be recognized by the General Court and the rights of the municipality in such property protected from impairment or loss except by the exercise of eminent domain and the payment of fair compensation. *Mount Hope Cemetery* v. *Boston*, 158 Mass. 509. *Ware* v. *Fitchburg*, 200 Mass. 61.

The Blackstone land at the time it was acquired by the town had not been put to any permanent use. It had only recently been released by the Colony to Blackstone. It was uncertain during the first years of the town's ownership whether the land should be divided or held as a Common. It was not until 1640, after attempts of the inhabitants to have the land divided among them had failed, that it was definitely decided that the land should be kept open as a Common [1] and the town dedicated the land to the public, and the city continued to develop the Common as a park after the town in 1822 accepted St. 1821, c. 110, and became a city. The city also set up the Public Garden as a public park after it again acquired the title to it in 1824. The city

---

[1] Boston Town Records, 52. Shurtleff, Topographical and Historical Description of Boston, 298, 300.

now by the dedication of the Common and the Public Garden to the public as a public park holds these parcels of land for the benefit of those for whom the parcels have been set apart. That the city holds the title for the public benefit has been frequently referred to in our decisions. *Steele* v. *Boston*, 128 Mass. 583. *Veale* v. *Boston*, 135 Mass. 187, 188. *Lincoln* v. *Boston*, 148 Mass. 578, 580. *Commonwealth* v. *Davis*, 162 Mass. 510, 511.

We now pass to a consideration of St. 1946, c. 294, which purports on its face to authorize the construction of an underground garage in the Common. Section 1 of c. 294 sets forth that the congestion of the public ways of Boston caused by the great number of motor vehicles has become a public nuisance which cannot be abated except by the construction and maintenance of a garage under the Common. Section 2 authorizes the city, acting through its park department with the approval of the mayor, to contract with a private corporation for the construction and operation of a garage, at the expense of the corporation and without cost to the city, to be located in the southwesterly portion of the Common, with necessary approaches above and below ground from Charles Street and also an entrance by means of a tunnel from Commonwealth Avenue and running under the Public Garden, the garage to be set back certain distances from Charles and Beacon streets; the city is empowered to lease the site for a term of not more than forty years at a rental of not less than two per cent of the gross receipts; the construction is to be completed within three years, and the gardens, lawns, trees and shrubs in the area of the work are to be restored to substantially the same condition in which they were prior to the construction, with the exception of the places of ingress and egress, and construction is to be carried on so that the filling or relocation of the Public Garden Pond will not be required.

The park department of the city with the approval of the mayor intends to secure the construction of the garage and has been negotiating with the respondent Motor Park, Inc., for the purpose of agreeing upon the plans and the provisions of the lease. Tentative plans have been prepared

and alterations have been suggested by the park department. These plans furnish a rough outline of the proposed structure. The tentative plans are for a three-story structure of reinforced concrete beneath about thirteen acres of the Common accommodating about three thousand five hundred passenger automobiles. Gasoline, oil, tires, and other accessories usually to be had in a garage will be sold. The front of the building will set back one hundred thirty-five feet from Charles Street. A tunnel commencing on Commonwealth Avenue between Berkeley and Arlington streets will run under the Public Garden and Charles Street to the second floor of the garage. Besides, there will be two vehicular entrances about twenty feet wide from Charles Street, sloping down to the top floor of the garage. There will be a tunnel for customers and employees running from the easterly end of the garage to Tremont Street at about opposite West Street. There may be other tunnels required for the use of persons in case of fire when the plans are completed and approved by the proper authorities. The roof of the garage will be about four or six feet below the present surface of the Common. It is contemplated to have a ventilating exhaust which will extend about fifteen feet above the ground and be located in and above the men's room at about where a similar structure now stands in the present ball field on the Common. Although the present plans for the garage are merely preliminary sketches, it is not to be assumed that it will be located, constructed and operated without reasonable regard to the use of the public in the Common and the Public Garden. *Boston* v. *Brookline*, 156 Mass. 172, 176.

We are not at all certain that the Lowell petition can be maintained as a taxpayers' petition under G. L. (Ter. Ed.) c. 40, § 53, to restrain the city from raising or expending money or from incurring obligations for any purpose for which it has no right to use public funds or to assume obligations. These petitioners urge that the receipt of revenue by the city will result in depriving the city of the defence which it now has in actions brought by persons injured by reason of a defective condition of the Common

or the Public Garden. We need not decide whether this result would follow because, if it would, the deprivation of this defence would not be the incurring of an obligation within the terms of the statute. *Kelley* v. *Board of Health of Peabody,* 248 Mass. 165. *Dealtry* v. *Selectmen of Watertown,* 279 Mass. 22. The construction of the garage will require the relocation of the water mains. The judge found that the performance of this work will cost $100,000 or more. There is nothing in this contention because the statute, St. 1946, c. 294, § 2, provides for the construction and operation of the garage "at the expense of the corporation and without cost to the city." An official of the Motor Park, Inc., testified that the relocation of these water pipes was an item of expense to be. borne by this corporation. It is to be assumed that the parties in this respect will act in good faith strictly in compliance with the express provisions of the statute. *Duffy* v. *Treasurer & Receiver General,* 234 Mass. 42, 50. The city has not incurred any expense and it is not made to appear that it will with reference to the proposed garage. It is suggested that the garage would not be subject to taxation. That would not result in the city losing any taxes where none now are assessable. *Burr* v. *Boston,* 208 Mass. 537. In any event, the taxation of the garage is a matter for the General Court, and the occupant of commercial property located on land owned by the Commonwealth or held by the city in trust may be made liable for the tax. *Boston Fish Market Corp.* v. *Boston,* 224 Mass. 31. *Stoneman* v. *Boston,* 263 Mass. 255. *Irving Usen Co. Inc.* v. *Assessors of Boston,* 309 Mass. 544. These petitioners finally contend that the lease will impose certain obligations on the city. No particular provisions of the contemplated lease have been brought .to our attention. It is assumed that it will contain a covenant for quiet enjoyment. Contracts are made to be kept, and as a practical matter it is not shown by this record that the city is likely to be dispossessed of the locus or that it is probable that it would wrongfully eject the lessee. Moreover, the execution of a lease is sanctioned by the General Court, and the giving of the lease can hardly be said to amount to the

incurring of an unauthorized obligation unless the statute is invalid. All these matters, reaching as they do to the essentials required for the maintenance of a taxpayers' petition under the statute, G. L. (Ter. Ed.) c. 40, § 53, would require serious consideration if this petition were held to be otherwise maintainable. *Browne* v. *Turner,* 176 Mass. 9. *Commonwealth* v. *McNary,* 246 Mass. 46.

Still confining our discussion to the Lowell petition, we pass to a consideration of the validity of St. 1946, c. 294. The legislative declaration as to the public conditions which led up to the enactment of the statute and the purpose sought to be accomplished are entitled to great weight. *Lajoie* v. *Milliken,* 242 Mass. 508, 521. *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* 304 Mass. 288, 293–294. *Block* v. *Hirsh,* 256 U. S. 135. *Woods* v. *Cloyd W. Miller Co.* 333 U. S. 138. The necessity for a statute is for the General Court to determine, and so is the selection of the means to be employed for the accomplishment of the public purpose for which the statute was enacted in the absence of any impairment of private rights. We are not concerned with the alleged need or the proposed means, whatever our personal opinions might be as to the wisdom of the legislative judgment. The only question for us is whether it was within the competency of the General Court to pass the statute. *Slome* v. *Chief of Police of Fitchburg,* 304 Mass. 187. *Attorney General* v. *Secretary of the Commonwealth,* 306 Mass. 25. *Commonwealth* v. *Hudson,* 315 Mass. 335. *Robinson's Case,* 320 Mass. 698. The title to the Common and the Public Garden is in the city; the beneficial use is in the public. The town did not take the land under any trust, although it has dedicated it to a public use and now holds it for such use, and the General Court represents those entitled to the use and enjoyment of both parcels of land. It is settled that the ownership in and the management by the city of a public park, which was acquired free of any trust, conditions, or restrictions, is subject to the paramount control of the General Court. *Higginson* v. *Treasurer & School House Commissioners of Boston,* 212 Mass. 583, 584. *Wright* v. *Walcott,* 238 Mass. 432, 435.

The General Court could authorize the city to lease the site of the garage to a private corporation for not more than the maximum term or· not less than the minimum rental designated by the statute. This legislation did not go so far as the statute in *Browne* v. *Turner,* 176 Mass. 9, where the city through a board was directed to construct a subway at its own expense and lease it to. a particular railway company; or the act in *Prince* v. *Crocker,* 166 Mass. 347, where the city upon the acceptance of the statute was directed to construct the Boylston and Tremont streets subway without the payment of compensation; or the enactment in *Codman* v. *Crocker,* 203 Mass. 146, where the city was ordered without any acceptance of the statute and without compensation to construct the Cambridge and Boston subway and to lease it to the Boston Elevated Railway Company. In the instant case, by the terms of the statute, it was optional with the city, acting through its park department with the approval of the mayor, to enter into a contract with some private corporation for the construction and operation by the latter of a garage. In maintaining the Common and the Public Garden, the city was merely acting as representative of the general public, which in turn was represented by the General Court, and if the latter determined that it would be to the advantage of the general public to eliminate the congestion of traffic, even if this necessitated the withdrawal from public use of comparatively small areas of the surface of the Common for entrances to and exits from the garage, it had power to make the choice or to leave the answer, as it did here, to the city. *Stone* v. *Charlestown,* 114 Mass. 214. *Howes Brothers Co.* v. *Unemployment Compensation Commission,* 296 Mass. 275, 288. If the city executed a lease, the garage would during the term of the lease be in the exclusive possession of the corporate lessee for the conduct of a purely commercial venture for its own profit. The objection that the General Court was without power to permit the city to enter into such a transaction would undoubtedly call for serious consideration if the sole purpose of the act were the construction and operation of the garage and nothing more.

We would then have to decide whether the maintenance of the garage stood in such a relation to the public interest that land could be taken by the city and leased for its maintenance or for the parking of automobiles as seemed to have been assumed in St. 1946, c. 474, and decided in *Whittier* v. *Dixon*, 24 Cal. (2d) 664. The objection rests upon a mistaken view of the statute. The garage is an incident in a legislative plan designed to abate a public nuisance arising from serious traffic congestion due to the greatly increased use of motor vehicles and their parking in the public ways of the city. The garage is a method employed to accomplish the primary purpose of the statute. Statutes reasonably designed to eliminate a public nuisance have been sustained, although some particular benefit to private individuals has resulted. *Talbot* v. *Hudson*, 16 Gray, 417. *Moore* v. *Sanford*, 151 Mass. 285. *N. Ward Co.* v. *Street Commissioners of Boston*, 217 Mass. 381. The object sought to be reached by the statute, it is said, could not be realized by the action of private individuals, for the statute indicates that the nuisance could not be abated "except by construction and maintenance of a garage under Boston Common." The applicable principle governing the validity of St. 1946, c. 294, is somewhat similar to that sustaining housing authority statutes primarily enacted for the abatement of nuisances by the elimination of slum districts, although incidently conferring a personal benefit on those earning low incomes who would become occupants of the new structures. *Allydonn Realty Corp.* v. *Holyoke Housing Authority*, 304 Mass. 288, 296–297, and cases cited. It was held in *San Francisco* v. *Linares*, 16 Cal. (2d) 441, that the city could construct a large garage under a public square, where the surface of the square would not be permanently interfered with except by the entrances to the garage, and lease the garage for the term of fifty years. See also *Oakland* v. *Williams*, 206 Cal. 315; *Marchant* v. *Mayor & City Council of Baltimore*, 146 Md. 513; *Central Land Co.* v. *Grand Rapids*, 302 Mich. 105; *In re Mayor of New York*, 135 N. Y. 253. We are of opinion that St. 1946, c. 294, was within the power of the General Court to enact for the

purpose of eliminating a public nuisance even though it will result in withdrawing from the use of the public a small part of the surface of the Common.

. The Pierce petition seeks the enforcement of trusts created for the benefit of Boston Common. The McCarthy petition seeks the enforcement of the Parkman gift. George Francis Parkman devised all the residue of his estate to the city of Boston for the purchase and improvement of land for a public park, the land to be located near a thickly inhabited section of the city. He pointed out a parcel of land which he considered would be desirable for the purpose, although "The indication of the above is intended as a suggestion and not a specific direction for the location of the Park"; and if the city at the time of his death had acquired land for a park situated as near as possible to the site he had suggested so that the purchase of the site mentioned would be unnecessary, "then the said bequest is to be applied by the city to form a fund the income of which is to be used for the maintenance and improvement of the Park already created as above and of the Boston Common. . . . This bequest is made to the City of Boston in the hope and expectation that the Boston Common shall never either in whole or in part be diverted from the present use as a Public Park for the benefit and enjoyment of its citizens." He provided by a codicil that the clause of his will devising the residue of his estate to the city "is modified as follows, and anything therein contained inconsistent with this codicil is hereby revoked. I devise said residue to the City of Boston to constitute a fund, the income of which is to be applied to the maintenance and improvement of the Common and the Parks now existing and is not to be used for the purchase of additional land for park purposes. Any portion of said income which may not be required for the above purpose in any year is to be added to and invested as a part of said fund."

The testator desired at the time he executed his will that the city should purchase land for a park in the locality mentioned by him, and that the income of the trust should be used for the maintenance and improvement of this park

and the Common. At the time he executed the codicil he desired that the income of the residue be applied to the maintenance and improvement of existing parks and the Common but not for the purchase of any additional land for parks. The general rule is that will and codicil are to be read together and that the provisions of the will are to be construed as altered or affected by the terms of the codicil only to the extent that the terms of the latter are inconsistent with the provisions of the former, in the absence of a manifestation of a contrary intent of the testator. *Gray* v. *Sherman,* 5 Allen, 198. *Lovering* v. *Balch,* 210 Mass. 105. *Gilmore* v. *Doherty,* 317 Mass. 188. *Crozier* v. *Billington,* 318 Mass. 416. The testator provided that the portion of the will inconsistent with the codicil should be revoked. The case comes within this general rule. The codicil substituted a new plan for that mentioned in the will in so far as the codicil differed from the will as to the particular parcels of lands which were to be maintained and improved. The benefaction for the Common itself expressed in the codicil was attended with the same incidents and qualities as those expressed in the will. *Tilden* v. *Tilden,* 13 Gray, 103. *Snow* v. *Foley,* 119 Mass. 102. *O'Brien* v. *Lewis,* 208 Mass. 515. The testator remained constant in his purpose to make a disposition of his property for the benefit of the Common, and his expression in the will that he was making a provision for the Common "in the hope and expectation" that the Common should not be diverted in whole or in part from its present use must be considered in construing the codicil. The question presented is the effect and force which must be given to the words just quoted. The quoted words are ordinarily of a precatory nature, but the setting in which they are employed has sometimes given them a mandatory character imposing an imperative duty upon those to whom they are addressed. The inquiry usually is whether such words sufficiently manifest an intention to create a trust. *Warner* v. *Bates,* 98 Mass. 274. *Aldrich* v. *Aldrich,* 172 Mass. 101. *Poor* v. *Bradbury,* 196 Mass. 207. *Blunt* v. *Taylor,* 230 Mass. 303. *Temple* v. *Russell,* 251 Mass. 231. We are not here concerned with that inquiry

because a trust was in fact created.   The question presented is whether these words are an inherent and essential part of the trust or amount to no more than the expression of a wish or suggestion, compliance with which was intended by the testator to be discretionary with, rather than obligatory upon, the trustee.   The will and codicil show that the testator knew how to express in apt and accurate language a command, limitation or condition as distinguished from a wish, hope or expectation.   We are of the opinion that the testator used the words "hope and expectation" in the ordinary sense as expressing a desire and a wish and not as imposing a limitation or condition which constituted an integral and essential part of the trust.   The withdrawal of comparatively small areas of the surface of the Common from public use as contemplated for the operation of the proposed garage can hardly be said to result in a material interference with the public uses.   See *Codman* v. *Crocker,* 203 Mass. 146, 151.   We are of opinion that the proposed use of these areas will not constitute a breach of any mandatory and essential provision as distinguished from one of "hope and expectation" such as contained in the Parkman trust.   *Drury* v. *Natick,* 10 Allen, 169, 183.   *Dickson* v. *United States,* 125 Mass. 311.   *Davis* v. *Barnstable,* 154 Mass. 224, 226.   *Ware* v. *Fitchburg,* 200 Mass. 61, 67.   *In re Estate of Secrest,* 109 Neb. 431.   *Manners* v. *Philadelphia Library Co.* 93 Pa. 165, 173.   *Ogden, petitioner,* 25 R. I. 373. *Newport Hospital* v. *Harvey,* 49 R. I. 40.

The city in its answer to the Lowell and Pierce petitions set up a counterclaim seeking a declaratory decree under G. L. (Ter. Ed.) c. 231A, inserted by St. 1945, c. 582, § 1, that it owned the premises in question in absolute fee free from any trusts or restrictions whatever and that St. 1946, c. 294, was valid.   We deal with this matter, as did the parties, in connection with the Pierce petition.   An adjudication of the title is an appropriate subject for a declaratory decree, and the city is entitled to a decree adjudging that it holds the premises for the purpose of a public park.   It is doubtful whether the city is entitled to an adjudication that St. 1946, c. 294, is valid by reason of its failure to give notice

to the Attorney General in accordance with c. 231A, § 8. See Borchard, Declaratory Judgments (2d ed.) 275. We have decided that the statute is valid; and as a formal adjudication to that effect would not confer any benefit or advantage upon the city in addition to that enuring to it by virtue of this opinion, we see no necessity of including it in a declaratory decree. G. L. (Ter. Ed.) c. 231A, § 3.

Decrees are to be entered dismissing all petitions including the counterclaim in the Lowell case, and a decree is to be entered on the counterclaim to the Pierce petition that the city has title to the Common and the Public Garden subject to an easement in favor of the general public for the purposes of a public park.

*So ordered.*