Middleton, J.
Reduced to its simplest terms, the question presented to this court for decision is, Does the city of Columbus possess the right and power to acquire and operate off-street parking facilities and, if so, can the cost thereof be financed by the issuance of mortgage revenue bonds which are to be secured only by such parking facilities and the revenues derived therefrom and which do not create a debt of the city and do not involve a pledge of the general credit of the city?
Before discussing the sections of the General Code which may be involved, we will consider the powers of Ohio municipalities under the Constitution of Ohio. Article XVIII of the Constitution relates to municipal corporations. By Section 3 thereof all powers of local self-government are granted to municipalities. Section 7 thereof provides that any municipality may frame, adopt, or amend a charter for its government and may, subject to the provisions of Section 3 of said Article, exercise thereunder all powers of local self- *88 government. These provisions of the Constitution are self-executing and require no legislation for their implementation. Village of Perrysburg v. Ridgway, a Taxpayer, 108 Ohio St., 245, 140 N. E., 595; City of Middletown v. City Commission of Middletown, 138 Ohio St., 596, 37 N. E. (2d), 609.
The powers granted municipalities under the constitutional provisions above referred to are subject to the restrictions or limitations contained in any other provision in the Constitution. It is, therefore, necessary to determine whether there is any constitutional provision which would deny the city of Columbus the right to pursue the course of action proposed in the ordinance under consideration.
In this connection, Article XII of the Constitution, which treats of the subject of finance and taxation, must be considered. By Section 2 of Article XII it is provided that no property taxed according to value shall be taxed in excess of one per cent of its true value in money for all state and local purposes. The city of Columbus is bound by that provision. The same section permits the enactment of laws authorizing additional taxes to be levied outside the one per cent limitation when approved in the manner therein specified or when provided for by a city charter. Inasmuch as the ordinance under consideration does not create an indebtedness which must be met through the medium of taxes, Section 2 of Article XII does not affect the right of the city of Columbus to create the particular indebtedness and issue the bonds proposed under the ordinance in question.
Section 12 of Article XVIII does not negative the power of a municipality to do what is proposed in this ordinance. The maxim, expressio unius est exclusio alterius, does not apply. The effect of Section 12 of Article XVIII is to guarantee to municipalities the right to finance public utilities in the manner therein *89 set forth and to prevent the prohibition of such right by charter provision. In other words, this section of the Constitution is a limitation upon the provisions which may be adopted in the city charter.
Section 13 of Article XVIII provides that laws may be passed to limit the powrer of municipalities to levy taxes and incur debts for local purposes. Inasmuch as the ordinance in question does not contemplate levying taxes and does not incur a debt of the city, this section is not applicable.
“It frequently has been held that a debt limitation does not apply to a debt that is a lien upon specific property, and is not chargeable to the general fund. Likewise, although there is authority to the contrary, it is the prevailing view that a municipality does not create an indebtedness by obtaining property to be paid for wholly out of the income of the property, and that a city has the power to borrow money in excess of its debt limit for the purpose of investment in self-sustaining public utilities. Thus, a housing project financed by self-liquidating revenue bonds is not violative of a debt limit, and, although the constitutional provision applicable must be observed when payment is to be made out of utility receipts, it is generally held that bonds issued to pay for a waterworks, light plant or other utility which provide that they shall be paid solely from the income of such works or plant do not constitute an indebtedness.” 15 McQuillin, Municipal Corporations (3.Ed.), Section 41.34.
The principles announced in the last preceding paragraph have been approved and applied by this court in several decisions: Kasch v. Miller, Supt., 104 Ohio St., 281, 135 N. E., 813; State, ex rel. Public Institutional Bldg. Authority, v. Griffith, Secy. of State, 135 Ohio St., 604, 22 N. E. (2d), 200; State, ex rel. State Bridge Comm., v. Griffith, Secy. of State, 136 Ohio St., 334, 25 N. E. (2d), 847; State, ex rel. Allen, v. *90 Ferguson, Aud., 155 Ohio St., 26, 97 N. E. (2d), 660.
We find no constitutional provision which would prohibit a municipality doing the things proposed in the ordinance in question.
Has the General Assembly in the exercise of its constitutional powers enacted any prohibitive legislation which must be considered?
It is recognized that the authority of the state is supreme over the municipality and its citizens as to matters and relationships not embraced within the field of local self-government, and that the power to exercise sovereignty in local self-government, and local police power not in conflict with general law, does not confer upon municipalities the power to enact and enforce legislation which will obstruct or hamper the sovereign in the exercise of a sovereignty not granted away. Billings v. Cleveland Ry. Co., 92 Ohio St., 478, 111 N. E., 155; Niehaus, Building Inspector, v. State, ex rel. Board of Edn. of City School Dist. of Dayton, 111 Ohio St., 47, 144 N. E., 433; Prudential Co-operative Realty Co. v. City of Youngstown, 118 Ohio St., 204, 160 N. E., 695; State, ex rel. Brickell, Treas., v. Frank, Treas., 129 Ohio St., 604, 196 N. E., 416.
In the instant case, the activity on the part of the city contemplated by the ordinance in question is embraced within the field of local self-government. It does not involve extraterritorial operation. The performance of the acts authorized by the ordinance will not obstruct or hamper the sovereign in the exercise of the sovereignty not granted away.
In the Uniform Bond Act (Section 2293-1 et seq., General Code), it is provided by Section 2293-14: “The net indebtedness created or incurred by a municipal corporation shall never exceed five per cent of the total value of all property in such municipal corporation as listed and assessed for taxation.”
For the reason above stated, to wit, that the bonds *91 proposed under this ordinance do not create an indebtedness of the city, the proposed bond issue is not subject to the restrictions contained in this section of the Code.
We do not find any other provision of the Uniform Bond Act, or any provision elsewhere in the General Code, which might be construed as limiting the right of the city to issue the bonds in question.
This case is not considered as one involving the right of a city to own or operate a public utility. It is being considered as involving the question whether the proposed project will serve a public municipal purpose.
It has been said repeatedly that what is a public municipal purpose is not susceptible of precise definition. The decisions and texts, however, agree generally upon the basic elements which must be present to justify a finding of public municipal purpose.
In 15 McQuillin, Municipal Corporations (3 Ed.), 36, it is stated:
“* * * the public purposes for which cities may incur liabilities are not restricted to those for which precedent can be found, but the test is whether the work is required for the general good of all the inhabitants of the city.”
37 American Jurisprudence, 734, Section 120, states:
“What is a public use is not capable of absolute definition. A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and 'by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, *92 security, prosperity, and contentment of .all the in-' habitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. The phrase ‘municipal purpose’ used in the broader sense is generally accepted as meaning public or governmental purpose as distinguished from private. The modern trend of decision is to expand and liberally construe the term ‘public use’ in considering state and municipal activities sought to be brought within its meaning. The test of public use is not based upon the function or capacity in which or ,by which the use is furnished. The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.
“The determination of what constitutes a public purpose is primarily a legislative function, subject to review by the courts when abused, and the determination of the legislative body of that matter should not be reversed except in instances where such determination is palpably and manifestly arbitrary and incorrect. ’ ’
In determining the existence of a public use or a public purpose the courts of Ohio have throughout our history been guided by definition or general understanding of the terms in harmony with the text quotations appearing above. Such decisions appear from the earliest date in condemnation proceedings, in cases testing the scope and meaning of corporation charters, and in cases involving the right of municipalities to perform certain challenged acts in the conduct of municipal government. The specific question now before this court has not previously arisen in this state. It has, however, been submitted to the courts of last resort of several other states.
In Wayne Village President v. Wayne Village Clerk, 323 Mich., 592, 36 N. W. (2d), 157, 8 A. L. R. (2d), 357, the court decided a case in which mandamus was sought *93 to compel the defendant to countersign revenue bonds to be issued to finance a combined off-street and on-street village parking system. In the course of its opinion the court said:
“Parking facilities designed to relieve congested street conditions resulting from the use of motor vehicles in streets which obviously were not originally laid out to cope with present-day motor vehicle traffic have a definite bearing on public safety in the use of public streets.”
After construing the Constitution and statutes of Michigan, the court directed the execution of the bonds, saying:
“ * '* * we conclude that a municipal parking system combining parking facilities both on public streets and on off-street property of a municipality, for which a charge for use is made, is a public use, and a public, improvement within the meaning of the revenue bond act***.”
In McSorley v. Fitzgerald, 359 Pa., 264, 268, 59 A. (2d), 142, the Supreme Court of Pennsylvania upheld the constitutionality of a statute authorizing the establishment of off-street parking facilities and rejected the contention that off-street parking facilities did not constitute a public use. The court said in part:
“The attack on the constitutionality of the statute is based almost entirely on the contention that, the purpose for which the authority is created does not constitute a public use. * * * But a legislative declaration with respect to that question, while not conclusive, is entitled to a prima facie acceptance of its correctness * * *. Not only is the declaration of legislative findings in the present act impressive in pointing out the urgent need of legislation of this type, but the conditions it portrays are well known to all inhabitants of our larger cities. It is unfortunaté that many operators of automobiles habitually ignore the fact *94 that highways are intended primarily for travel and not for the storage of vehicles other than by way of transitory stops for loading and unloading. The congestion caused by such misuse of the streets and by the ever-increasing amount of motor vehicle traffic has become a major problem of municipal administration * * The widespread need of legislation to furnish such aid can be gleaned from the fact that in 1946 alone 65 cities opened new parking lots, and, by 1945, 22 states and the District of Columbia had enacted laws in some form dealing with parking facilities.
“Those attacking the constitutionality of such a law as that which is here under consideration obviously labor under the mistaken notion that its purpose is merely to cater to the convenience of the owners and operators of motor vehicles; on the contrary its effect may be to interfere with the perhaps greater convenience of parking on the public streets; its real purpose is to promote the' larger and more general good of the community by freeing the streets of the impediments and perils arising from dangerous and often intolerable conditions of traffic congestion. And since the act is concerned with the regulation of the transportation of persons and property along the highways of the municipality, and since the evils it seeks to remedy vitally affect conditions for the transaction of business, the prevention of accidents, the effective operations of fire and police forces, and, in general, the enjoyment of many phases of city life and activities, its justification stems directly from the exercise of the police power, which is the supreme power of' government. ’ ’
In City of Whittier v. Dixon, City Clerk, 24 Cal. (2d), 664, 667, 151 P. (2d), 5, 153 A. L. R., 956, the Supreme Court of California held that the acquisition and operation of public parking facilities would serve a public purpose, saying in part:
*95 “Just as public streets can be use'd for the parking of motor vehicles, property can be acquired for the same use. Moreover, public parking places relieve congestion and reduce traffic hazards and therefore serve a public purpose.”
In Miller v. City of Georgetown, 301 Ky., 241, 244, 191 S. W. (2d), 403, the court had before it the question of whether the city of Georgetown, in the absence of specific statutory authority, could acquire property for off-street parking purposes under its general power to acquire property for public purposes. In deciding that the city did possess such power the court said :
“It is a matter of common knowledge that the great increase in recent years of motor vehicles has created a situation, even in the smaller cities, which is fraught with danger to persons using the streets and causes inconvenience to the residents of the city. Under the power to regulate the use of vehicles on their streets, cities may, and frequently do, prohibit parking on the streets in congested areas, and we think the right to furnish parking space is a necessary adjunct to the right to regulate traffic, otherwise it would be impossible to achieve the general objectives of the statutory grant of power to regulate the use of streets by vehicles. ’ ’
See, also, Lowell v. City of Boston, 322 Mass., 709, 79 N. E. (2d), 713.
The decision in Barker, Jr., v. City of Kansas City, 146 Kan., 347, 70 P. (2d), 5, is the only one we have found which is not in complete harmony with the decisions in the foregoing cases.
It was stated in argument in support of the ordinance in question, and the statement was not challenged, that at least 22 states and the District of Columbia have some form of general enabling legislation dealing with publicly owned off-street parking *96 facilities and that at least 450 cities having over 10,000 population now own and operate parking lots. If these figures are correct the scarcity of court decisions with respect to the power of municipalities to acquire and operate off-street parking facilities is rather surprising. It is apparent, however, that the weight of authority to' date supports the view that the acquisition and operation of off-street parking facilities constitute a public municipal purpose.
It has been urged in support of the demurrer herein filed that the decision of this court in City of Cleveland v. Ruple, 130 Ohio St., 465, 200 N. E., 507, 103 A. L. R., 853, is a controlling authority to the effect that the city lacks the power to do that which is proposed in this ordinance. The facts of the Ruple case are easily distinguishable from those involved herein. In that case there was no claim of necessity or public purpose. The sole objective was for the city to derive revenue from the operation of a garage. That operation was properly characterized in the opinion as engaging in private and competitive business. Such is not the type of operation contemplated in the instant case and such is not the objective to be obtained.
In argument it was stressed that the ordinance in question recites that the necessity exists for the construction, maintenance, and operation, within the city, of off-street parking facilities for motor vehicles ‘ ‘ and facilities incident to the operation of such properties for the parking of motor vehicles,” and that the petition for writ of mandamus contains the allegation “that the city will impose and collect charges for the use of the project, including charges for the parking of vehicles and all uses incidental to or customarily provided in connection with parking facilities.” (Emphasis supplied.) It is claimed that that language indicates an intent to conduct an activity of much broader scope than the mere operation of parking *97 facilities and, in fact, an intent to carry on a competitive business such as would be prohibited under the. decision of this court in the Ruple case. We do not so construe the provisions of the ordinance. Obviously, the allegation of the petition, which is broader than the terms of the ordinance itself, cannot expand the effect of the ordinance provision. We construe the ordinance in question as authorizing only the acquisition, maintenance, and operation of facilities for off-street parking of motor vehicles, and as not contemplating or purporting to authorize the carrying on of a business involving any other type of transaction, or any business which would fall within the prohibitive provisions of the decision in the Ruple case.
It is our conclusion that conditions in a city may be such as to necessitate the furnishing of off-street parking facilities by the municipality and that the furnishing of the same, under such circumstances, would constitute the performance of a public municipal function. The congestion in downtown areas of large cities and the difficulty of operating vehicles through the streets are matters of such common knowledge as to come within the scope of judicial notice. The ordinance recites the conditions existing in the city of Columbus and declares that those conditions have reached the point where it is necessary for the city, in order to protect and preserve the public health and safety, to construct and maintain off-street parking facilities for motor vehicles. This constitutes a finding and declaration of necessity by the legislative body of the city. It is the function of the legislative body of the city to determine what improvements and expenditures are necessary for the public welfare of the city and to determine what constitutes a public municipal purpose. A determination so made by the legislative body will not be rejected or reversed by the court unless manifestly arbitrary or unreasonable. State, ex rel. *98 McClure, City Mgr., v. Hagerman, Dir. of Finance, 155 Ohio St., 320; 15 McQuillin, Municipal Corporations (3 Ed.), 36; 38 American Jurisprudence, 86, Section 395; 37 American Jurisprudence, 734, 735, Section 120; 64 Corpus Juris Secundum, 334, 335, Section 1835b. The petition, of which the' ordinance in question is a part, alleges such a condition of necessity and, on its face, indicates that the municipality is performing a public municipal function in adopting and carrying out the provisions of the ordinance.
It remains only to discuss the effect of Sections 3939-2 and 3939-3, General Code. It is our conclusion that the city of Columbus, having no provision in its charter prohibiting the acts proposed in this ordinance, has the power directly under the Constitution of Ohio to pass the ordinance, carry out its terms, and issue revenue bonds as provided therein. Its power in the premises is not derived from Sections 3939-2 and 3939-3, General Code. Section 3939-3, General Code, purports to empower a municipality, for the purpose of acquiring, constructing, maintaining, and operating off-street parking facilities or lands required therefor, to “issue and sell bonds pursuant to the provisions of the Uniform Bond Act, or issue and sell mortgage revenue bonds in the same manner and under the same terms and conditions as mortgage revenue bonds may be issued by municipal corporations under the authority of Article XVIII, Section 12 of the Constitution of Ohio. ’ ’
Section 12 of Article XVIII of the Constitution empowers any municipality to finance the acquisition, construction, or extension of any public utility by the issuance of mortgage bonds beyond the general limit of bonded indebtedness provided the bonds so issued shall not impose any liability upon the municipality but shall be secured only upon the property and revenues of such public utility, including a franchise stat *99 ing the terms upon which, in case of, foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than 20 years from the date of sale of such utility and franchise on foreclosure. We conclude that this reference to Section 12 of Article XVIII is without significance in determining the issues in this case, for the reason previously stated, to wit, that the power of the city is not derived from Sections 3939-2 and 3939-3, General Code. This conclusion disposes of the argument that the ordinance and the bonds to be issued thereunder are invalid because of failure to include a franchise as required in Section 12 of Article XVIII.
The city has the power to pass, carry out, and enforce the ordinance in question irrespective of Sections 3939-2 and 3939-3, General Code. We do not, however, find that those sections of the General Code are in contravention of the Constitution but merely that they are unnecessary for the accomplishment of the project under consideration. Mention of those sections of the Code in the ordinance and apparent reliance upon the authority of those sections for the enactment of the ordinance do not, in our judgment, invalidate the ordinance or the bonds to be issued thereunder.
It is the conclusion of this court that the petition for writ of mandamus, of which the proposed ordinance is made an integral part, states a sufficient cause for the issuance of a writ of mandamus as prayed for. Consequently, the demurrer to the petition is overruled.

Demurrer overruled and writ allowed.

Weygandt, C. J., Zimmerman, Stewart, Tapt, and Hast, JJ., concur.
Matthias, J., concurs in the judgment.